CHRISTOPHER and TILTON *vs.* THE MAYOR, &C. OF THE CITY OF NEW-YORK, and others.

The corporation of the city of New-York has no power to make a contract with a particular individual for the building of a market, without advertising for proposals, and without making it through the head of one of the departments. MITCHELL, J. dissented.

A contract entered into in pursuance of a resolution of the common council, where there has been no other order directing an advertisement for proposals than by a resolution passed by the *board of aldermen* only, is invalid.

The power of the courts to control the action of a municipal corporation is not limited to those cases where the corporation is a trustee for an individual, or a class of persons, in respect to a fund or other property in which such individual or class has a peculiar and personal interest, not common to all the corporators.

When an act is clearly illegal, and where the necessary effects of such act will be to injure, or impose a burthen upon the property of any corporator, there is enough to warrant the interference of the court.

THIS was an appeal from an order made at special term, continuing an injunction until the hearing. The injunction ordered the defendants, The Mayor, Aldermen and Commonalty of the city of New-York, Joseph R. Taylor, comptroller, William Adams, commissioner of repairs and supplies, and John B. Corlies, to refrain from acting under a resolution adopted by the board of aldermen of the city, on the 14th of October, 1851, relative to the rebuilding of Washington market; and also to refrain from acting or taking any steps under a resolution relating to the said matter, presented before and adopted by the said board of aldermen on the 29th of December, 1851; and from giving or executing any contract for the rebuilding of said market, under either of those resolutions, to the said John B. Corlies; and in case any such contract should have been executed, from acting under the same.

*R. H. Morris* and *M. S. Bidwell*, for the plaintiffs.

*H. E. Davies*, for the corporation of New-York.

*E. Sandford*, for the defendant Corlies.

EDWARDS, J.   The plaintiffs in this case alledge that they are, and for seven years have been, tax-payers and freeholders in the city of New-York; and that taxes and assessments are annually imposed upon each of their estates to the amount of upwards of one hundred dollars.   They further alledge, that on the 18th day of October, 1851, a resolution to rebuild Washington market upon its present site, and to give the contract for such rebuilding to John B. Corlies, he being (as is stated in the resolution) the lowest bidder for the work, was adopted by the board of aldermen, and subsequently by the board of assistant aldermen, and sent to the mayor for his approval ; that within ten days after its receipt by the mayor, he returned it to the board of aldermen, where it originated, with his objections, and that subsequently thereto the resolution was reconsidered and passed by both boards of the common council.

The plaintiffs contend that in passing this resolution the common council acted in contravention of the charter and ordinances of the city, and they ask to be relieved from the burthen which they alledge will necessarily be imposed upon them as freeholders and tax-payers, if the resolution shall be carried into effect.

The principal grounds of objection which are taken to the validity of the resolution are, 1st. That there was no advertisement for estimates ; and 2d. That the giving of the contract to Corlies was an executive act, which the common council had no authority to perform.

The resolution states that Corlies was the lowest bidder, and seems to assume that there was an advertisement for estimates. The facts of the case, as explained by the affidavit of the commissioner of repairs and supplies are, that, in pursuance of a resolution passed by the *board of aldermen alone,* he advertised in four of the public newspapers published in the city of New-York, and that no other resolution was passed, and no other advertisement for proposals or estimates was published.

The amended charter of the city of New-York provides that "all contracts to be made *by authority* of the common council for work to be done, shall be made by the appropriate heads of departments, under such regulations *as shall be established by*

Christopher *v*. The Mayor, &c. of New-York.

*ordinances* of the common council." (*Laws of* 1849, § 23, *p*. 283.) Under this charter an ordinance was passed by the common council, and approved by the mayor on the 30th May, 1849, entitled " An ordinance organizing the departments of the municipal government of the city of New-York, and prescribing their powers and duties." This ordinance provides that all work to be done, with certain specified exceptions, shall be performed by contract. (§ 493.) It also provides that all contracts to be entered into on the part of the corporation, must be authorized by the common council, and when so authorized, shall be made by the department under whose direction the work is to be performed. (§ 492.) The ordinance further provides that the several departments which are empowered by section 493 to make contracts on the part of the corporation, shall issue proposals for estimates therefor, and advertise the same in the corporation papers, for at least ten days before the day on which the estimates are to be opened. (§ 495.)

It appears then, by the charter and ordinances, that all contracts to be entered into on the part of the corporation must be authorized by the common council, and when so authorized must be made by the department under whose direction the work is to be performed, and they must be made according to the regulations established by the ordinances. In a case like the one before us the commissioner of repairs and supplies is charged with the duty of making the contract, and in the discharge of that duty he is required to issue proposals for estimates, and to advertise the same. This is a duty which he is to perform after he has been " empowered" by the corporation to make the contract; and it is after he has received proposals for estimates, and not till then, that he is to make the contract, and it can be made in no other way.

At the time that the advertisement in this case was published, the corporation had not authorized the work to be done. A resolution had passed the board of aldermen only. It seems, then, that the provisions of the charter, and of the ordinances which the charter required to be passed for the purpose of carrying out its provisions, have not been complied with, and any contract

entered into in pursuance of the resolution passed by the common council would be invalid.

The next question is whether the common council had the power to designate the person with whom the contract should be made.

The ground on which the plaintiffs contend that they have no such power is that it is an executive act. The counsel for the defendants, on the other hand, contend that it is not necessarily an act of an executive character, but that it is one of those acts which partakes so far of a legislative character, that it may belong to either department of the municipal government of the city. There may undoubtedly be some acts which do not come exclusively within either division of the powers of the government, and which may without violence to language, be classed under either head; and, perhaps, this is one of that character. But it seems to me, that the common council in passing the ordinances which they have established, for the purpose of regulating the making of contracts, have virtually acknowledged this power to be vested in the department of repairs and supplies. The duties which are to be performed by that department, as to obtaining estimates, and which are to be performed after the common council have authorized the contract, assume that the person is not to be designated until the necessary information has been obtained. And whatever conclusion he may come to as to the general power of the common council in reference to the person with whom the contract is to be made, they certainly had not the power to designate the person with whom the contract should be made, at the time and in the manner that they did.

But it is contended that this is a legislative act, and that, being such, it is not subject to restriction or control. This would undoubtedly be the case if the common council had acted within the scope of their legislative powers. But the ground on which the plaintiffs ask, and on which alone they can be entitled to, relief is, that the common council have transcended their legislative powers.

It is further contended that the power of this court to control the acts of a municipal corporation, is limited to those cases

Christopher *v.* The Mayor, &c. of New-York.

wnere the corporation is a trustee for an individual, or a class of persons, in respect to a fund, or other property, in which such individual or class has a peculiar and personal interest, not common to the whole of the corporators. It is true that most of the cases in which the court has interfered have been cases of that character, and that the proceeding has been by information, filed by the attorney general. (*The Attorney Gen.* v. *Heelis,* 2 *Sim. & Stu.* 67. *Attorney Gen.* v. *The Mayor of Liverpool,* 1 *Mylne & Craig,* 171.) But is there any good reason why the power of the court should be restricted to such cases? It seems to me that when an act is clearly illegal, and when the necessary effect of such act will be to injure, or impose a burthen upon the property of any corporator, there is enough, according to every principle which has regulated the action of courts of equity, to warrant the interference of the court. In the case of *Bromley* v. *Smith,* (1 *Sim.* 8,) it was held that where a matter was necessarily injurious to a common right, a portion of the parties injured might institute a suit, although a majority of the persons interested approved of the act complained of. In this case there was no express trust, and no peculiar interest in the persons who filed the bill. And it was also held that it was not necessary that the proceeding to restrain the illegal act should be by information filed by the attorney general. (*See also Gray* v. *Chaplin,* 2 *Sim. & Stew.* 267.)

But it is said that the plaintiffs have not such an interest as corporators as will entitle them to the relief which they ask. It appears by the complaint that they are tax-payers and freeholders in the city. The necessary effect of the act complained of will be to impose a burthen upon their real estate. Their interest, then, is as certain and direct as that of a stockholder in a moneyed or other corporation.

The order made at the special term must be affirmed with costs.

ROOSEVELT, J. concurred.

MITCHELL, J.   The principal question presented in this case
is whether the corporation of New-York have a right by resolu-
tion or ordinance passed in common council, to make a contract
with an individual chosen by them, to build a market on their
own grounds, at an agreed price and on specific plans, or whether
this can be done only through one of the heads of departments,
and after advertising for the lowest bids.

The section principally relied on to defeat the contract is the
23d of the act of 1849, amending the charter of the city.   That
is that "all contracts to be made or let by authority of the com-
mon council for work to be done, or supplies to be furnished,
and all sales of personal property in the custody of the several
departments or bureaux, shall be made by the appropriate heads
of departments, under such regulations as shall be established
by the ordinances of the common council."   This section follows
some twelve or thirteen others prescribing the duties of various
departments, to whom the executive business of the city was to
be intrusted.   The natural inference is that it was intended to
control those departments, and them only, and not the common
council, who are to pass the laws which the departments are to
execute.   A slight attention to the wording of the section con-
firms this inference.   It is "all contracts to be made or let *by
authority* of the common council for work to be done," &c.: it
is not "contracts made by the common council," but made by its
authority.   A contract made by an individual personally is not
made by his authority; nor is a contract made by direct resolu-
tion of a corporation made by its authority : it is made, in the
one case, by the individual, and in the other by the corporation,
without the intervention of any one acting by its authority.
But if made by an agent of an individual or corporation, or by
a head of department, in pursuance of authority delegated by
the principal, then it can with propriety be said to be made by
the authority of such individual or corporation.   So there is a
like limitation of this section in the next subject treated of—
namely, sales of personal property : it is not all sales of per-
sonal property, but of personal property in the *custody* of the
several departments.   Any personal property which the corpora-

tion does not subject to the custody of any department would not be affected by this section. These contracts and sales are to be made under such *regulations* as shall be established by the common council. The term *regulations* implies a rule for a general course of action. It does not apply to a case in which specific instructions are to be given, applicable to that case alone, as here, where only one thing was to be done.

Again; the corporation certainly have the right to direct what shall be the maximum cost of the market, and what shall be its size and dimensions, and of what materials it shall be composed. In all these they could legislate as to the most trifling minutiæ : what should be the height of the stories, the number of stories, the width of windows and doors and of stairs, is all under their control. A departure in any one of these minutiæ, from their views, might be so objectionable to them that they would reject the whole plan. If so, they can prescribe all the material parts of the contract. Who the contractor should be is as essential to be under their control, as what the materials should be. A market, such as this is designed to be, is intended to be an ornament to the city, and to be worthy of admiration for its taste and usefulness. Those who would erect such a building must not only have their own plans, but they must have the builder and architect and superintendent of their own choice, or their whole object will be frustrated. One may be so peculiarly fitted for a work of this nature, in the estimation of those concerned, that while his services could be obtained he would be their only choice. The corporation still order the portraits of distinguished individuals to be taken, to adorn the public halls. Can they order the portrait to be taken and not say by whom it shall be done; or at what cost, or of what size ? Or must they send a resolution to the head of a department for him to advertise for proposals for the lowest bidder to take the likeness of a former mayor, and then must the execution of the painting be given to the lowest bidder ? If the corporation in these cases can make the entire contract, without the intervention of a head of a department, they can do so in any other case, where they are to direct a specific piece of work to be done, and

its general mode of execution. The erection of a suitable market requires more care in the choice of the person by whom it is to be done, than the painting of a hundred portraits. On the skill, the honesty, the experience of the builder, may depend the whole ultimate usefulness of the building. What private individual would intrust the building of the high bridge to the lowest bidder? or what private individual, constructing a work of one-fourth of the cost of the intended market, would have it built by any one except the man of his own choice, in whom he had the most unbounded confidence? It cannot be that in matters of such importance, a power so necessary to their perfect completion, should have been denied to those who are to direct their execution. The Russ pavement may be the best that can be laid, and Russ might have a patent for his plan. Cannot the corporation contract with him for the work? A mode was discovered of piercing the Croton pipes, without stopping the flow of the water in the pipes, and without disturbing the surface of the soil, and the patent for it was sustained, and the corporation were obliged to buy the right of the patentee, so far as this city was concerned. If he had been willing only to do the work and charge a fair price for it, and not to sell his patent, could not the corporation have contracted with him what that price should be? The true meaning of this section, both in its letter and spirit, is that whenever the common council direct a specific piece of work to be done, in a manner which they prescribe, they may also say at what price and by whom it may be done. But that when work is done under contract by the heads of departments, or is simply ordered by the common council to be done, without further directions, it shall be done by the appropriate head, under such general regulations as the common council may prescribe, and that if in any case the common council prescribe how or by whom, or at what cost it shall be done, that will control the department.

The making of the contract, and in making it, stating one essential to every contract, namely, the person with whom the contract is made, is not an executive act, within the meaning of section 21 of the amended charter of 1830, or section 9 of the

amendment of 1849. The constitution of this state declares that "the legislative power of this state shall be vested in a senate and assembly," (*Art.* 3, § 11,) and that "the executive power shall be vested in a governor." (*Art.* 4, § 1.) It is not pretended that the legislature can exercise executive any more than it can judicial powers; yet it has been always deemed part of the undisputed power of the legislature to authorize the doing of work by, or the purchase of property from, particular individuals, at prices fixed in the act. If the naming of the party with whom a contract was to be made was a purely executive act, the legislature could not do this. After the contract is made by the corporation, it then becomes the duty of the executive officers to see that such contract is executed according to the contract so made.

Neither is the seventh section of the act of 1849 violated. No money is now to be drawn. But when the first installment shall become due, by sufficient work being done to justify its payment, the head of the proper department will render his specific and detailed statement in writing through the comptroller, of what has been done: and on the basis of this statement the common council would appropriate the necessary sum to be drawn from the proper fund, and after that the money would be drawn from the city treasury. This would be the course, whether the contract was made before or after advertisement, and by the common council or the head of a department.

It was argued that section 13 gave the control of all work to be done to the department of repairs, exclusive of the control of the corporation; because it has the "cognizance of all repairs and supplies." But that does not give the department power to say what repairs shall be done, nor by whom; but when the repairs are ordered by the common council, with all such minutiæ as to price, style of work, and even the person by whom to be done, as the common council may direct, then the cognizance or overseeing of the execution of all such repairs does devolve on this department. Any other interpretation would make despots of each head of department; and the comptroller as head of the department of finance, which "*shall have control*

*of all the fiscal concerns of the corporation,"* (§ 11,) might dispose of the funds of the city as his wisdom might dictate, not as the corporation should direct.    He has the control which a mere *executive* officer of that department should have and with that limitation it is over all the fiscal concerns of the corporation ; but that gives him no power to make any contract except by direction of the corporation, and as it may prescribe.    So that the street department has cognizance of opening, regulating and paving streets, (§ 12,) that is, to see that the orders of the common council on those subjects are executed; but the common council alone has power to order a street to be opened or regulated.    The like distinctions apply to all the departments.

It was also said that this contract violates the law authorizing the mayor, &c. to create "public building stock No. 3," (*Act of* 1851, *ch.* 304,) because the whole cost of the building will exceed $300,000, and the act prevents their *issuing* an amount of said stock exceeding $150,000 during the year 1851, and the like sum in 1852, and $100,000 in 1853.    Although the building is to cost more than $300,000, yet it will take more than one year to finish it, and the contract is so framed that no more is to be paid and no more stock is to be issued in any year, than the amount which the corporation is authorized to issue of stock in that year.

Besides, the contract of the corporation may be valid, although no funds be provided for its payment.    A new building on its own lands is not an acquisition of more real estate, even if the corporation were restricted as to the value of the real estate to be acquired by it, where the acquisition is necessary for the purposes of its charter.    In my opinion the injunction should be dissolved.

Order affirmed.

[NEW-YORK GENERAL TERM, June 11, 1852.    *Edwards, Mitchell* and *Roosevelt,* Justices.]