DE BAUN and THISTLE *vs.* THE MAYOR, &c. OF THE CITY OF NEW-YORK, and others.

A person owning real estate in the city of New-York, and paying taxes on it, may prosecute an action against the corporation, on behalf of himself and other tax paying citizens, to enjoin them from expending the money to be raised by taxation, in repairing or paving a street in a manner contrary to an express law, and tending to add to the taxes of the inhabitants. EDMONDS, J. and MORRIS, J. dissented.

Such suit need not be instituted by the attorney general; nor is it necessary for him to join in it. EDMONDS, J. and MORRIS, J. dissented.

The corporation of the city of New-York has no power to make a contract with an individual for the paving of streets, without advertising for proposals, and giving it to the lowest bidder.

THIS was an appeal by the defendants from an order made at a special term, denying the plaintiffs' motion for a permanent injunction, discharging the order to show cause, and dissolving the temporary injunction. The injunction asked for, was a writ to be issued against the defendants, the mayor, aldermen and commonalty of the city of New-York, commanding and requiring them to abstain and refrain from directing, permitting or suffering, or attempting to permit, direct or suffer the defendant Bartholomew Purdy, commissioner of repairs and supplies, entering into, making or executing a contract with the defendants Russ and Reid, or either of them, for the paving of Chatham-street, Park Row, Bowery and Fourth Avenue, as contemplated in and by a resolution of the board of assistant aldermen passed the 27th day of December, 1852, as in the complaint mentioned, and also against the said the mayor, aldermen and commonalty of the city of New-York, and the said Bartholomew Purdy, commanding them and each of them to abstain and refrain from entering into, signing, executing or receiving, or attempting to enter into, sign, execute or receive the contract mentioned in the said complaint and in the said resolution therein contained, or any like or similar contract, and from carrying or attempting to carry into effect the said resolution, and also commanding the said Horace P. Russ and George W. Reid to abstain and refrain from entering into, accepting, executing or attempting to enter

De Baun *v.* The Mayor, &c. of New-York.

into, accept or execute such contract as in the said resolution and complaint mentioned and contained.

The facts appear very fully, in the following opinions, deliverd by members of the court.

*Wm. Curtis Noyes,* for the plaintiffs.

*Robert J. Dillon,* for the corporation.

*Willard, Sweeney & Anderson,* for the defendants, Russ & Reid.

MITCHELL, J.   The first question is, can a person owning real estate in the city of New-York and paying taxes on it, prosecute an action against the corporation, on behalf of himself and other tax-paying citizens, to enjoin them from expending the money to be raised by taxation, in repairing or paving a street in a manner contrary to an express law, and to add to the taxes of the citizens ?

In *Adriance* v. *The Mayor, &c. of New-York,* (1 *Barb. S. C. R.* 19,) a suit by a tax-payer was instituted, in a case where the corporation was about to appropriate the moneys of the city contrary to law.   In *Kirby and others* v. *The Mayor, &c. of New-York, and Berrien,* a suit was also sustained by tax-payers, the corporation being about to purchase ground for purposes of burial, out of the city.   In *Christopher* v. *The Mayor, &c. of New-York,* (13 *Barb.* 567,) the question was raised and ably argued at general term, and decided in favor of the right of the tax-payer to sue, (*see p.* 571.)   The judge who gave a dissenting opinion in that case, said nothing on this question ; but he regards the decision of the court as authority until reversed.   In *Millhau* v. *Sharp*—the Broadway railroad case—(15 *Barb.* 193,) and in *Stuyvesant* v. *Pearsall*—the second avenue railroad case—(*Id.* 244) the same question was again presented at the general term, and with the same result.

The counsel for the defendants in this case argued this question in *Christopher's* case, and then with as much ability and

ingenuity and as much at length as in this case; and his distinguished associate made that question one of the main points of his argument. The question had therefore been fairly argued, and maturely considered and passed upon, before it was discussed in this case. The previous decisions should therefore be adopted as conclusive, until reversed.

It is supposed that the court, in the above cases, overlooked the provisions in the revised statutes as to "proceedings against corporations in equity." (2 *R. S.* 462.) Before that statute was passed, Chancellor Kent had decided that an injunction did not lie, at the suit of the *attorney general*, to prevent an insurance company from doing banking business; that this attempt to exceed its chartered powers was a *public offense* over which chancery had no jurisdiction, and was to be met by the remedy provided in the courts of law by *quo warranto* or an information. (*Attorney General* v. *Utica Insurance Co.* 2 *John. Ch.* 380.) But the chancellor there made a broad distinction between that case and the case of a private injury. He said "if the directors of the Utica Insurance Company were to appropriate the funds or capital of the company to their own private emolument, or if, disregarding the business of insurance, they were to divert the funds to the destruction of that object, by making roads, and canals, or building theaters or churches, I have no doubt this court would have a right, and would be bound, to interfere and check the abuse. But when the question is, whether a corporation has forfeited its charter, or has usurped a franchise, or has broken a penal law, the case is widely different. This court is not the proper tribunal to sustain the prosecution, or to inflict the punishment." "There is no complaint on the part *of the stockholders* of misconduct, nor is the information founded on any thing of that kind." Did not the chancellor mean by this that if there were any violation of the charter injurious to the corporation, they were the proper parties to complain, and might proceed by injunction; but that if the act complained of was one affecting injuriously only the people in their sovereignty—as by usurpation of a franchise not granted by the people—then the attorney general was of course the

De Baun v. The Mayor, &c. of New-York.

proper complainant, but his remedy was ample at law and was therefore there only? The legislature after this, deeming the remedy at law too tedious, and the more summary proceeding by injunction necessary, gave by the revised statutes power to the attorney general, even in the case of a usurpation of a franchise, a right to sue in chancery. The giving of this additional right to the attorney general, was not intended to take away any rights which private individuals had before enjoyed. Accordingly, a private individual may still obtain an injunction to prevent a company in which he is a corporator from using its funds for purposes unauthorized by its charter. That is an injury to his private rights. If he has this right in case of a private corporation, then the part of the revised statutes referred to, did not, in any case which it provided for, confer the exclusive right to sue, on the attorney general; but left all corporators, (whether of public or private corporations,) who before had a right to sue, the same right in full force. Without the act the attorney general could not sue in chancery, and the act was passed simply to cure that defect. This court having repeatedly held that a tax payer has such an interest in the money raised and to be raised by the city, that he may prosecute such an action where the corporation is committing such a violation of its charter as will add to the burthen of the tax payers, and the statute not taking away any individual rights, but merely giving an additional remedy, the right of the tax payers to sue must be sustained. The injury done in this city by excessive taxation unauthorized by law, is a private injury in which the tax payers of the city are the individual sufferers, rather than the public. The people out of the city bear no part of the burthen, and the people within the city except the tax payers, also bear no part of it. It is therefore an injury peculiar to one body of men—the tax payers of the city

The second question was, whether the corporation could make a contract without advertising for proposals, and giving it to the lowest bidder. This was decided in the negative, in the case of *Christopher ;* and the judge who dissented from his brethren

on that point feels bound by the decision of the court, whatever may have been his individual opinion.

These two points being against the defendants, the injunction should be sustained, and the order appealed from reversed without costs.

ROOSEVELT, J.   The plaintiffs in this case, as owners of real estate and *tax payers* in the city of New York, on behalf of themselves and all others similarly situated, claim relief by injunction against the corporation of the city, on the ground of an alleged attempt wrongfully to appropriate the public moneys and property, and thereby to incumber the plaintiffs' real estate with undue taxation, by entering into an alleged unlawful contract with Messrs. Russ and Reid for paving the Bowery and other streets, at an expense of nearly three-quarters of a million of dollars.

In December, 1852, it appears, Messrs. Russ and Reid presented their memorial to the common council, stating that the materials for the completion of Broadway, would all be prepared in a short time, and that the Bowery, Chatham-street and Park Row, as the next important thoroughfare, were next entitled to the Russ pavement.   A few days afterwards the board of assistants passed a resolution directing a contract to be made accordingly, at an expense of six dollars and fifty cents per square yard, besides the old materials valued at some sixty or seventy thousand dollars more.   Immediately upon the publication of this proceeding, Messrs. Cumming & Pollock, perfectly responsible men, offered to do the work in the same manner at $5,50 the square yard.   On the 22d of April, John B. Morrell & Co. offered to do the work at $3,50 a yard, and to bind themselves with ample sureties that the " pavement (when done) should not be inferior in durability and appearance to any laid in the city." The board of aldermen, notwithstanding, five days afterwards, with both these proposals before them, concurred in the resolution of the assistants, and sent it to the mayor for his signature.

The mayor, on the sixth of May, vetoed the measure, as inexpedient and as in direct violation of law.   A majority of the

members of the two boards, it was understood, had determined, notwithstanding, that the contract should be made. The plaintiffs thereupon applied to me for a temporary injunction, not against the members individually, but against the corporation and its officers, and Russ and Reid. I had previously entertained a similar application in the case of the Washington market, involving, as it appeared to me, precisely the same principles. As that injunction had been sustained, after full argument at special term, and subsequently, likewise, on appeal at general term, I saw no ground for denying the like relief in the present case. I accordingly made the usual order to show cause, with a temporary injunction in the meanwhile. My colleague, however, before whom the case was then brought, conceiving that an important provision of the revised statutes, bearing on the subject, had been overlooked in the previous decisions, instead of granting a further injunction dissolved the temporary injunction already issued; and from that order an appeal has been taken to a general term and argued before all the five judges of this district.

It will be observed, by recurring to the dates above detailed, that the measure in question, after being introduced into one of the boards, seemingly slumbered in the other from December to April. On the 12th of April, for reasons well understood as matter of public history, the legislature passed the amended charter, containing among other provisions one for strengthening the veto power of the mayor, and another requiring all contracts, like the one proposed, and all sales of public property and franchises, to be first duly advertised and then given " to the lowest bidder with adequate security." This act before becoming a law, was to be submitted to the people at an election on the first Tuesday of June. In the interval, on the 20th of May, the board of assistants again passed their original resolution, and the board of aldermen were to do the same on the day following, little more than one week before the sense of the people was to be taken on the amended charter.

Were not these proceedings on their face, to say nothing of the breach of trust, a clear and palpable fraud contemplated on the action of the legislature ?  " It is conceded," says the judge,

whose decision is appealed from, " that the resolution was *hur-
ried through the common council so as to forestall the act of*
1853." In that light, passing over the other considerations sug-
gested in the plaintiffs' bill, I viewed the transaction. And so
viewing it, if the court possessed the power, as it had been re-
peatedly held they did, I did not feel myself at liberty to deny
its application to the case, or to refuse to issue the injunction
prayed for. It was accordingly issued on the evening of the
20th of May ; and was served, not on the members of the com-
mon council as a deliberative body, but on the officers of the cor-
poration, as a corporation, and like any other corporation. And
herein, it is said by the counsel for the defendants, lies the error.
The corporation of the city of New-York is *not*, say they, like
any other corporation ; it is a *legislative* body, and as such
exempt from the jurisdiction of the courts.

Much alarm has been expressed by counsel, but not felt it
would seem by the community, at the interference, so called, of
the judicial with the executive and legislative departments of
the government. The maxim, implied in this argument, I had
always supposed had reference to the government of the state or
nation. In that view the maxim is a sound one, and deserving
the most implicit obedience. But is the common council of this
city, with its power to light and pave streets and build and reg-
ulate markets, and pass by-laws and ordinances with ten dollar
penalties, in any just sense of the terms, or within the reason
and spirit of the maxim, the legislative department of the
government ? By the third article of the constitution, which it
is presumed is the best authority on this subject, it is declared
that " the legislative power of this state shall be vested in *a
senate and assembly*." And although the senate and assembly,
if they see fit, may, from time to time, according to the same
article, confer upon the boards of supervisors " powers of local
legislation and administration," yet no one will contend that such
a delegation of authority, in subordination to the senate and
assembly, even if the clause embraced the common council, would
place that body beyond the reach of the regular administration
of justice ; or exempt its action from the control of another ar-

De Baun *v.* The Mayor, &c. of New-York.

ticle of the constitution, which declares that "there shall be a supreme court having general jurisdiction in law and equity." Even the learned justice whose decision is under review designates the claim, put forth by counsel, of "entire immunity for municipal corporations," as involving "a bold proposition," at which his brother judges "might well have been startled."

Every corporation, whether for banking, insurance, manufacturing, municipal or railroad purposes, has the power of making by-laws, and is vested therefore, in some sense, with legislative authority. Indeed every individual, with a family, if it be at all well governed, may be said, in the same sense, to legislate, and to be vested by law with powers of local legislation and administration. But is the exercise of these powers, in such cases, merely because for convenience of expression we call them legislative, to be exempt from the jurisdiction of the courts, both at law and in equity ? In the case of the state legislature, representing in all its fullness under the constitution, the sovereignty of the whole people, there is an obvious fitness, and an equally obvious necessity, for the exemption. Does either that fitness or that necessity apply to subordinate corporations, whether their by-laws act upon streets or upon railroads ? In the exercise of a merely discretionary power no one claims a right to control them, or rather to overrule their judgment. But in a case of fraud, or illegality, or gross breach of trust, no reason exists why the courts should not afford a remedy, as well against corporations, be they great or small, as against individuals. Corporations are but trustees. They are endowed with trust powers and sometimes also with trust property—both the appropriate subjects of equity jurisdiction—to prevent the misapplication of the one and the misuse of the other. And what, in this respect, is the difference between a board of aldermen and a board of any other directors ? When the latter, in pursuit of their own, invade the interests of their stockholders, none deny the power and the duty of the court to interfere. And shall it be said that the former, even if, in the exercise of the delegated taxing power, they should in effect attempt to appropriate every house and lot in the city to their own individual use, cannot be re-

De Baun *v.* The Mayor, &c. of New-York.

strained at the instance of the sufferers, by any tribunal known to the law ? If this were so, it would argue in this city the existence of a despotism which no freeman would be willing to submit to. I cannot assent to a proposition leading to such results; and do not wonder that it should have been characterized, even by a friendly pen, as "bold and startling."

One of my colleagues, who admits the correctness of the decision in the Washington market case, when speaking of the action of the same judge in the present case, says "the justice at chambers had no jurisdiction, upon the complaint of a citizen, to interfere by injunction with the municipal legislation of the city." Now what, I would respectfully ask, is the difference, in principle, between the market contract and the pavement contract? The corporation, in each case, were the owners of the soil, in trust, in the one case for the public use as a thoroughfare, in the other for the public use as a market, or for the public use generally. In the one case, the measure complained of was the contemplated tearing down of the existing market, and incurring a heavy debt to put *up* a new one; in the other the contemplated tearing *up* of the existing pavement, and incurring a heavy debt to put *down* a new one. In both, the old materials, of considerable value—some thousands of dollars—were to be given to the fortunate contractors; and in both, some hundreds of thousands of dollars, raised or to be raised by taxation, were also to be appropriated to the same object. In both, the corporation officers and contractors and the corporation as such—not the members of the common council— were made parties defendant; and in both the plaintiffs seeking relief were individual tax-payers, and the relief prayed for and granted was the restraining the defendants from making the threatened contract, which was to result in the creation of an unjust incumbrance upon the plaintiffs' property. Can it then be said, with correctness, that there is any difference, "palpable" or otherwise, "in the facts and the legal principles applicable to these two cases?" (13 *Barb.* 567.)

It was said in the market case, as in the pavement case, that the filing of a bill by a tax-payer, although on behalf of himself

De Baun *v.* The Mayor, &c. of New-York.

and all others, who chose to come in, was an unheard of proceeding, whatever might be the breach of trust on the part of those who controlled the corporation name. Several authorities, however, were cited which it is unnecessary to discuss, in contradiction of this position. But suppose it were an unheard of proceeding; would that circumstance alone demonstrate that the proceeding was not warranted by law? The whole history of the common law is a history of unheard of proceedings. Its leading principle, and its chief recommendation, are its power of adapting itself from time to time to the ever varying changes of society. And if unheard of grievances arise, unheard of remedies, if necessary, may be applied.

An objection, stated in the opinion of the court below, that if this suit by two, out of a great number of tax-payers, can be sustained, then every other tax-payer may bring a like suit, and thus engender " an overwhelming mass of litigation," is founded, I conceive, in misapprehension. The present suit is not brought by the two plaintiffs merely on their own behalf, but " on behalf of all the tax-payers in the city." No other independent suit, therefore, would be necessary or be permitted; and should another be instituted, all proceedings in it, according to the established rule, would be stayed.

Again; it is said the attorney general, as representing the public at large, should be a party. As a mere matter of con venient practice, having no reference however to the abstract right of the case, it might perhaps be well, under circumstances to be judged of by the court, to require in some cases the insertion of his name. Where a compromise, to the prejudice of the citizens generally, was apprehended, the judge in granting the preliminary injunction, at the instance of one or more private tax-payers, might insert a provision in the order directing it to be inoperative, unless within a reasonable time that officer should join in the complaint—thus preventing a discontinuance of the proceeding without his consent. In that view, and in that view only, do I consider the making of the attorney general a party as at all requisite. The provision of the revised statutes, supposed by the judge, who dissolved the injunction, to have been

overlooked by his colleagues, to my apprehension has no bearing on the case. It refers simply to the creation of a substitute by bill in equity for the old writ of quo warranto, where a corporation "usurped a franchise" not granted them by their charter; such for instance as the attempt by the Utica Insurance Company, incorporated solely for insuring against fire, to issue bank notes as a circulating medium. The state having reserved certain "franchises" to itself, very properly provided that the attorney general, the officer of the state, should prosecute the suit when those franchises were invaded. But will any one contend that paving is a state franchise, and that the making of an unlawful or fraudulent contract for paving is the usurpation of a state franchise? Such a contract, it is obvious, as it seems to me, if it involves as a consequence the incumbering of private property with an undue burthen of taxation, is a mere breach of trust as against the owners of such property. It is a wrongful exercise of a trust power, confided to the corporation by the taxpayers, and in which the tax-payers alone, legally speaking, have any interest. They therefore are the proper persons to sue for, and the supreme court sitting in equity, the proper tribunal to grant redress. Suppose five hundred citizens, and it must be the same with as many thousands, had voluntarily, instead of compulsorily, contributed a million of dollars to the treasury of the corporation, in trust to be applied to lighting, paving, grading, and the other legitimate objects of city expenditure, and the members using the corporate name, instead of applying the fund according to the intent of the donors, were threatening, under the name of legislation, to divide this munificent bounty among themselves; would the contributors, in such case, have no right, and the courts no power, to stay their hands? And is such an exercise of power, thus invoked, or rather such a discharge of official duty, to be branded as "judicial usurpation?"

When the people think so—and the people, it should be remembered, are the constitutional tribunal to pass upon this issue— they can readily and no doubt will promptly and effectually make their sentiments known and felt through their representatives in the senate and assembly, the proper legislative department

of the state. I have seen no indications in that direction, as yet, and should no greater "usurpations" than the issuing of such injunctions as the present take place, I apprehend none.

For the reasons stated, and others which, were it not for the brevity necessarily imposed upon me, might be urged, more especially after the same question of jurisdiction had been elaborately argued and decided, not only several times at special term, but also at two general terms of the supreme court, and one general term, before a full bench of six judges, of the superior court—for these reasons I say I am of opinion that the injunction, in this case, was not "improperly granted," but that the order, dissolving it, was itself improperly made and ought therefore to be reversed.

EDWARDS, J. concurred.

EDMONDS, J. dissented.

MORRIS, J. The facts stated in the complaint and not refuted by the defendants, are the following: The plaintiffs are *inhabitants* of the city of New-York, and own therein a large amount of real and personal estate which is subject to be assessed for taxes to meet and pay the municipal expenses of the city, and the expenses of paving the streets mentioned in the resolution set forth in the proceedings. On the 27th day of December, 1852, the board of assistant aldermen, of the "Mayor, Aldermen and Commonalty of the City of New-York" adopted and passed a resolution authorizing the commissioner of repairs and supplies to enter into a contract with Russ & Reid, two of the defendants, to pave Park-row, Chatham-street, the Bowery and a part of the Fourth-avenue, with the Russ pavement; containing a specification of the work to be done, and the price to be paid per yard; appropriating fifty thousand dollars, to be paid the first year; and stipulating that Russ & Reid were to have the old paving stones, &c. On the 27th of April, 1853, the resolution was adopted by the board of aldermen, and sent to the mayor for his action. On the 6th of May, 1853, the mayor returned

the resolution with his objections, to the board of assistant alder-men, where it originated.

On the 20th of May, 1853, the board of assistant aldermen reconsidered and adopted the resolution, notwithstanding the mayor's objections, and sent it to the board of aldermen for their action. On the 21st of May, 1853, while the resolution was pending in the board of aldermen, for their legislative action, the plaintiffs, as inhabitants and owners of property, and tax payers of the city of New-York, for their own benefit as well as in behalf of all the owners of property and tax payers in said city, instituted this suit, and in accordance with the prayer of their complaint, obtained from a justice of this court an injunc-tion order, restraining "the mayor, aldermen and commonalty of the city of New-York" from "attempting to permit, direct or suffer the defendant Bartholomew Purdy [commissioner of re-pairs and supplies] entering into, making or executing a contract with the defendants Russ & Reid, &c. as specified in the resolu-tion then pending before the board of aldermen, and command-ing the said 'the mayor, aldermen and commonalty of the city of New-York' and the said 'Bartholomew Purdy' [commissioner of repairs and supplies] to abstain and refrain from entering into, signing, executing or receiving, or attempting to enter into, sign, execute or receive the contract mentioned in the said com-plaint and in the said resolution therein contained," or any like or similar contract, "and from carrying or attempting to carry into effect the said resolution" then so pending before the board of aldermen for their legislative consideration and action.

The only means by which "the mayor, aldermen and com-monalty" can "attempt to permit or authorize" one of their subordinates to perform an act, or can themselves "attempt to authorize a contract" to be made, is by members of the common council at a meeting of one of the boards, in their legislative capacity, advocating or voting for a resolution or ordinance directing or authorizing the performance of the act. Therefore the injunction order granted by the justice at chambers, which was dissolved by the special term, and the injunction which this appeal seeks to restore, would (if authorized by law) restrain

and control the legislative action of members of the common council, and make the legislative power of the municipal government subject to judicial interference, supervision and dictation.

The allegations of fraud, contained in the plaintiffs' complaint, are so fully met and refuted by the defendants, that the counsel for the plaintiffs did not upon the argument attempt to use them as fortifying his positions. All allegations of fraud thus being out of the case, the determination of this appeal depends upon legal questions only.

The power of the "mayor, aldermen and commonalty" over the streets of the city, is among the political powers granted to the corporation as a municipal government, to be exercised by the common council, the legislative branch of the corporation. (*City Charter and Kent's Notes*, 7, 58, 143, 145.) This is the only right and power which "the mayor, aldermen and commonalty" have in and over the streets; as such, it has been exercised by them from the organization of the government, and recognized and proclaimed by an unbroken chain of judicial opinions and decisions. It is a governmental power and duty; not a franchise yielding emolument and revenue, as ferries, markets, places of interment, and the Croton aqueduct, &c. Chancellor Kent, in his notes upon the city charter, page 142, note 31, says: "The sixteenth section gives to the common council power to establish, direct, lay out and alter, *repair and amend* streets," &c. "This is a grant of a public nature, without any private interest, or property or revenue connected with it, and it has always continued with the common council under free and active exercise, subject nevertheless at all times, to legislative interference and direction." Also in note 29, commencing at page 132, in speaking of the immense political power possessed by the corporation in relation to streets, &c. and the ordinance power, he says: "The efficient checks against any abuse of such enlarged discretion, are public opinion, the elective franchise, and the established principles of the constitution and of recognized common law. In addition to these checks, all corporations are liable to legal process in behalf of the state, for nonuser or *misuser* of their rights and powers." In this case

the charge is misuser. In the case in the supreme court, *The Corporation of the City of New-York* v. *Brittain and others*, the question considered was, the power of the corporation over the streets. Chief Justice Nelson delivered the unanimous opinion of the court, and in speaking of the powers of the corporation says: "The rights and privileges thus granted [he is speaking of the special private franchises made as well for the private emolument and advantage of the city, as for the public good] are altogether distinct and different from those with which the defendants are invested under the charter as a municipal body. The latter class [municipal powers] comprises a large body of *political* powers, granted solely for *public objects and purposes, with which the private interests and estate of the defendants, strictly speaking, have no concern;* these powers are conferred *for the benefit of the city as a community,* and the end sought to be attained, its good government. On looking into the charter, it will be found to embrace an extensive grant of *political power, legislative, executive and judicial,* which so far as granted, *represent these great departments of the state government, and which are lodged with the defendants in their capacity as a municipal corporation. The legislative power is conferred upon the common council.* Now it certainly requires no argument to prove that the powers of the defendants, brought into exercise in forming and entering into the covenants and stipulations in question, *providing for cleaning the streets, public wharves and piers of the city, and sweeping the same, belong to and were part and parcel of its legislative and executive authority, wholly independent and disconnected from the particular class or body of powers having reference to their interest and affairs as a private company.*" In the cause in this court of *Milhau and others* v. *Jacob Sharp and others,* known as the Broadway railroad case, (15 *Barb.* 193,) although I dissented from my associate justices, Edwards and Strong, in the final conclusion they arrived at, yet upon the subjects of the power and authority of the corporation over the streets of the city, and of the want of jurisdiction in this court by injunction to interfere with the

De Baun *v.* The Mayor, &c. of New-York.

political legislative action of the common council, the justices holding the term and deciding that cause were unanimous.  Justice Edwards, in his opinion uses the following unmistakable and conclusive language.  " By the Dongan charter, the then existing streets within the city, were expressly granted to the corporation, together with the power of laying out such streets in future, as might be needful and convenient, and *the general control of the streets,* as such, has always been vested in the corporation as the protector and manager of the public right for the common benefit of all.  The mayor, aldermen and commonalty of the city of New-York are a public municipal corporation, &c.  A public municipal corporation is always created for *political* purposes.  It is invested by the sovereign power with subordinate legislative powers, to be exercised within certain local limits.  Its powers are subject to the control of the legislature.  Thus, it will be seen, that as far as it acts in the exercise of *its political* powers and within the limits of its charter, it is vested with the largest discretion.  And whether its laws are wise or unwise, whether they are passed from good or bad motives, it is not the province of this court to inquire."

Justice Strong, in his opinion states : " The adoption of ordinances or resolutions for the improvement of the streets is nowhere declared to. be an executive duty, but is the exercise of a power devolved upon the common council in its legislative capacity.  The resolution making the grant in question, with reference to the improvement of Broadway as a street, was pending before the common council when the injunction was issued, and that process, if effectual, would necessarily have interrupted and eventually prevented legislative action.  I can find no warrant for this interference, either in any legislative enactment or judicial determination.  It is a familiar principle that legislative action is not subject to judicial control."  " Judges are elected or appointed to administer the laws, not to make them, or to interfere in their enactment."  " Upon the whole, I am satisfied that the learned judge, by whom the injunction in question was allowed, went beyond the jurisdiction of his court; because, first, such injunction was restrictive of legislative action ;"

" and *third*, it transcended the limits established by the practice of the court of chancery." In the correctness of the legal principles thus proclaimed by my associates in that cause, I fully concurred ; which made the opinion of that court, as far as those legal principles were concerned, unanimous.

The subject matter of this suit is, the *paving of streets.* *The paving of streets*, by all, is conceded to be on the part of the corporation, *the performance of a municipal political duty*, done by them in *their character of a municipal political body.* In relation to which Justice Edwards says, "as far as it acts in the exercise of its political powers and within the limits of its charter, it is vested with the largest discretion, and whether its laws are wise or unwise, whether they are passed from good or bad motives, it is not the province of this court inquire." And Justice Strong says, " The adoption of ordinances or resolutions for the improvement of streets," &c. " is the exercise of a power devolved upon the common council in their legislative capacity." " The resolution making the grant in question, with reference to the improvement of Broadway as a street, was pending before the common council when the injunction was issued, and that process, if effectual, would necessarily have interrupted and entirely prevented legislative action. I can find no warrant for this interference either in any legislative enactment or judicial determination. It is a familiar principle that legislative action is not subject to judicial control." " Judges are elected or appointed to administer the laws, not to make them or to interfere in their enactment." " Upon the whole, I am satisfied that the learned judge, by whom the injunction in question was allowed, went beyond the jurisdiction of his court ; because, *first.* Such injunction was restrictive of legislative action." " And *third*, it transcended the limits established by the practice of the court of chancery."

These legal principles are applicable to and control this case. The justice at chambers had no jurisdiction upon the complaint of a citizen, by injunction, to interfere with the municipal political legislation of the city. The counsel for the plaintiffs upon the argument claimed that the decision of this court, in

*Milhau* v. *Sharp and others*, was not only authority for the principles he contended for, but was a decision of this court upon the point in question, and that the justice at special term was judicially bound to follow it as the settled law of this court.   I do not so understand that case.   In my judgment there is a palpable difference in the facts and of the legal principles applicable to, these two cases; some of which differences are the following : 1. The Broadway case was instituted after the legislative body of the common council had exhausted their legislative action upon the subject, after the law had been passed by the legislative power ; while in the present, all the matter was pending before, and was being considered by the legislative body of the corporation.   2. In the Broadway case the action was brought by one set of individuals against another set of individuals who formed no part of the city government, to test the legality of a law then already passed ; while in this case, the suit is instituted by individuals against the government itself, for the purpose and with the express object to prevent the legislative body of the city government considering or voting for a proposed law then pending before them in their municipal political legislative capacity.   3. In the Broadway case the corporation were to *receive revenue* for the permission granted by them to the defendants, and the majority of the court placed their decision in that case expressly upon the position that the corporation having granted the private property of the corporation to the defendants for a sum of money less than they were offered for it by other parties, the corporation were guilty of a breach of trust, because they did not take the largest sum offered, which would have been most beneficial to their *cestuis que trust*—the taxable inhabitants.   The majority of the court put their decision expressly upon the ground, that the grant was of the private property of the corporation, and for which they were bound as trustees to take the largest price offered. In that case Justice Edwards says : " In my judgment, it is immaterial what particular name is given to this thing which is thus granted.   Whether it be a thing corporeal or incorporeal, or whatever be its legal designation, it is a species of property of

some kind. It is a property held by the city, and is subject to the same trusts and duties as is its other property. The question then arises, whether the corporation has violated its duty as a trustee, in making the grant in question. The true question is, what amount of benefit might have accrued to the city in case that the most advantageous offers made had been accepted? If it had accepted the offers which it refused, the burthen upon tax payers would have been reduced, to the same extent to which the public treasury would have been benefited." Justice Strong says: "The common council has no authority, under the city charter or any statute, to give away or make an improvident grant of *the public property.*" Whereas, in the present case, the city has no property in the street, and can receive no revenue from Russ & Reid for the privilege of paving the streets. It is not an act of the corporation in relation to its private property, but is a municipal political duty performed for the benefit alike of all the citizens, whether taxable or not, and for travelers using the streets whether they be residents or not of the state or union, and for which the city must pay and cannot receive money. There is no feature in the one case (upon the principle which the majority of the court decided it) that can be distorted into a similitude of any feature contained in the other. The cases cited by the counsel for the plaintiffs upon the argument of the cause, *The Berrian fraud* and the *Washington market* cases, were in relation to the private property of the corporation in which the taxable inhabitants of the city had an interest as *cestuis que trust*, the corporation being their trustees; and as is the case in ferries, public roads and places, piers, wharves, slips, Croton water works, &c.

The present case is in relation to one of the ordinary, recognized, and admitted municipal political duties, the cost of which is to be defrayed by taxation, and in all respects is similar in principle to sweeping the streets, lighting the city with gas or oil, supporting the poor, burying the dead, protecting the city against the ravages of an epidemic, the destruction of buildings to stop a conflagration, the expenses of the fire department, of the police and of the military when called out to sup-

De Baun *v.* The Mayor, &c. of New-York.

press a riot or repel an invasion, authorizing the military to fire upon a mob, or an invading force, so as to exempt those who obey the order to fire from the penalty of murder, should they kill any one.

In my judgment, if the principle contended for in this cause be law, then can a tax-payer of the city by injunction suspend the action of the city government in attempting to feed the poor, bury the dead, light the streets, extinguish fires, and suppress riots, &c. for the jurisdictional reason that the plaintiff owns property which by taxation might be obliged to contribute something towards the expense. It will be said no judge would grant such injunction. That may be, but still it is impossible to anticipate how far precedent might extend the present injunction epidemic. I, however, am unwilling by any opinion of mine, even by implication, to be considered as asserting that our institutions are so constituted that the law deems the possesssion of property to be supreme to the government, and that a man, because he possesses wealth, has the legal right to stop the government from attemping to protect the community, and from performing duties alike demanded by the ordinary dictates of humanity, and by official oaths. The point presented, that a private citizen cannot institute proceedings against a municipal corporation to restrain excessive jurisdiction, but that such suit must be instituted by the attorney general, is well taken. This point is so clearly presented, and so conclusively disposed of, by the justice who decided this cause at special term, (Justice Edmonds,) that it is only necessary for me to refer to his opinion and say I fully concur in it.

The order appealed from should be affirmed, with costs.

Order appealed from reversed.

[NEW-YORK GENERAL TERM, October 3, 1853. *Edmonds, Edwards, Mitchell, Roosevelt* and *Morris,* Justices.]