## SUPREME COURT.

### MILHAU AND OTHERS agt. SHARP AND OTHERS.

The corporation of the city of New-York, by the Dongan charter, was invested with "full power, license, and authority, to establish, appoint, order, and direct the establishing, making, laying out, ordering, amending, and repairing of all *streets*, lanes, alleys, highways, &c., in and throughout the city, necessary, needful and convenient for the inhabitants of said city, and for all travellers and passengers there." This power has never been withdrawn or essentially changed. The corporation yet has the exclusive right and legislative sovereignty in this respect, to control and regulate the use of the streets in the city. An ordinance *regulating* a street is a *legislative* act, entirely beyond the control of the judicial power of the state.

But the corporation have no power, by resolution of their boards of Aldermen, to grant authority and license to a number of individuals organized as an association for the purpose, the right, upon certain conditions and stipulations, to lay a track for a railway in a street in that city and to run cars and carry passengers for a stipulated fare, for ten years, &c.

Because, it is essentially a *contract*, by which the corporation assume, for what they deem an adequate consideration, to *surrender a portion of their municipal authority*. This can only be done by authority and acts of the legislature.

And where no right to rescind the grant is contained in such resolution, the corporation has no power to revoke the license after the grant takes effect, because, valuable rights become *vested* in the associates, or grantees.

It is very questionable whether the corporation has authority to contract beforehand, that for *ten years*, at least, the cars (or carriages) of the associates shall be *licensed*. The license for carriages (by the charter) is to be given by the mayor, *for the time being*.

Although the corporation have power and authority, from time to time, to regulate the *rates of fare* to be charged for the carriage of persons, yet they have no power to contract that any individual or number of individuals, in an associate capacity for ten years, shall have power to demand and receive from every passenger whom they may carry in their cars or carriages, from one point to

another, a *fixed sum*. This is invading the *legislative power of their success-*
*ors*, which the corporation have no right to do. Besides, it would operate as
a perpetual *monopoly*.

Where an act of the corporation is clearly illegal, and the necessary effect of
such act will be to injure the property of another, the court is warranted in
restraining the illegal act by a *perpetual injunction*.

*New-York Special Term*, *Oct*. 1853. On the 29th of De-
cember, 1852, the Board of Aldermen of the city of New-York
adopted a resolution, whereby it was declared that the defend-
ants, and those who might, for the time being, be associated
with them, designated as the associates of the Broadway Rail-
way, should, upon certain conditions and stipulations therein
specified, have the authority and consent of the Common
Council to lay a double track for a railway in Broadway, &c.
The resolution was adopted by the Board of Assistant Alder-
men on the 30th of December. The associates named in the
resolution on the same day filed with the clerk of the Common
Council their written acceptance of the resolution, and an
agreement on their part to conform to its provisions. The
Mayor of the city did not concur in the resolution.

The plaintiffs brought their action against the persons named
in the resolution, to restrain them from entering into or upon
Broadway for the purpose of laying or establishing a railroad
therein, and from digging up, or subverting the soil, or doing
any other act in said street tending to encumber the same, or
obstruct the free and common use thereof as the same had been
enjoyed.

It is stated in the complaint that the plaintiffs are severally
owners of certain lots of land and premises upon Broadway;
and they severally claim that they are the owners of the land
in front of their lots to the centre of the street, subject only to
the public easement, or right of way, over the same. It is fur-
ther stated that the plaintiffs are all residents and corporators
of the city, and have been assessed and have paid taxes upon
their said property to a large amount. It is further stated that
the defendants, under color of the authority contained in the
resolution of the 30th of December, 1852, threatened, and gave
out, that they would enter into and upon Broadway with their

workmen and servants, and take up the pavements, and dig up
and subvert the soil, and would lay down and establish a rail-
road in· said street, and run cars thereon, for their own private
interest and emolument, to the great injury and damage of the
plaintiffs and other property owners upon that street; that if
the defendants should be permitted to take up the pavement in
Broadway and establish a railroad there, the property of the
plaintiffs would be seriously and irreparably injured and dam-
aged. It is charged that the resolution and the acceptance
thereof are of no binding force or effect, and confer no power
or authority whatever upon the defendants to take up the pave-
ment, or establish a railroad upon Broadway. The conditions
and stipulations annexed to the resolution granting to the de-
fendants authority to construct their railroad, and the other
matters stated in the complaint, are sufficiently noticed in the
opinion of the court. The action is prosecuted by the plaint-
iffs on their own behalf, and in behalf of all other tax-payers,
citizens, and inhabitants of the city, and owners of property in
Broadway. The material allegations in the complaint, except
the adoption of the resolution, were controverted by the de-
fendants. The issues were brought to trial at a special term
held in the city of New-York, in October, 1853. A great num-
ber of witnesses were examined; but as the decision of the
court does not involve an examination of the evidence in the
case, it is unnecessary to state the testimony.

JOHN VAN BUREN & H. HILTON, *for Plaintiffs.*
D. D. FIELD, *for Defendants.*

HARRIS, Justice. Whether the corporation of New-York
has an estate in fee, either absolute or qualified, in the streets
of that city, or a mere right of way held for the public use, is
quite immaterial for the purposes of this action. In either case
it must be conceded the corporation has the right of control
over the streets. By the Dongan charter it was invested with
" full power, license, and authority, to establish, appoint,
order, and direct the establishing, making, laying out, ordering,
amending, and repairing of all streets, lanes, alleys, highways,

&c., in and throughout the city, necessary, needful, and convenient for the inhabitants of said city, and for all travellers and passengers there." This power has never been withdrawn, or essentially changed. The corporation yet has the exclusive right to control and regulate the use of the streets in the city. In this respect it is endowed with legislative sovereignty. The exercise of that sovereignty has no limit so long as it is within the objects and trusts for which the power is conferred. An ordinance *regulating* a street is a *legislative act*, entirely beyond the control of the judicial power of the state.

But the resolution in question is not such an act. Though it relates to a street, and very materially affects the mode in which that street is to be used, yet, in its essential features, it is a contract. Privileges exclusive in their nature, and designed to be perpetual in their duration, are conferred. Instead of regulating the use of the street, the use itself, to the extent specified in the resolution, is granted to the associates of the Broadway Railroad. For what has been deemed an adequate consideration the corporation has assumed to surrender a portion of their municipal authority, and have, in legal effect, agreed with the defendants that, so far as they may have occasion to use Broadway for the purpose of constructing and operating their railroad, the right to regulate and control the use of that street shall not be exercised. That the powers of the corporation may be surrendered, I do not deny; but I think it can only be done by authority of the legislature. Thus it was provided by the charter of the Hudson River Railroad Company, that its railroad might be located on certain streets of the city of New-York, " provided the assent of the corporation of the city be first obtained." (*Session Laws*, 1846, *p.* 274, *sec.* 4.) Authority to give such assent is implied in the act itself; and the corporation, having, in pursuance of such authority, given its assent to the location of the railroad, and the railroad company having located their road accordingly, the assent became irrevocable. The company acquired a right to the use of the streets for the purposes of its road, and, to a corresponding extent, the corporation was deprived of its power to regulate

and control the use of the streets. So in the case of the Har
lem Railroad. (*Sess. Laws*, 1831, *p.* 327, *sec.* 11.) That corpo
ration was authorized by the legislature to construct their road
across or upon any street in the city of New-York, with the
consent and approbation of the mayor, &c., of the city. The
same provision is found in the General Railroad Act. (*Session
Laws*, 1850, *p.* 224, *sec.* 28, *sub.* 5.) It is thus that the city
corporation may, to the extent contemplated by the legislature,
restrict its own power to control and regulate streets. (See
Drake agt. the Hudson River Railroad Company, 7 *Barb.* 508.)
But for the authority derived from the legislature, I am unable
to see how a municipal corporation can grant permission to
construct a railroad upon *one of its* streets, which, operating as
a contract and vesting rights in the grantee which cannot be re-
called, must limit the power of such corporation to manage and
control the use of the streets. I think it cannot be done. It
cannot be that powers vested in the corporation as an important
public trust can thus be frittered away or parcelled out to indi-
viduals or joint-stock associations, and secured to them beyond
control. It was asserted by the defendants' counsel upon the
trial, that the authority to construct a railroad, conferred upon
the defendants by this resolution, may at any time be recalled.
If this were so, if the resolution could be regarded as a mere
revokable license, it would relieve the case from a fatal diffi-
culty; for I am not prepared to say that, in the exercise of the
discretionary power with which the corporation is endowed, in
the management and regulation of streets, it may not authorize
an individual or association to lay down a railroad track even
in Broadway. But this resolution goes farther: it authorizes
the associates to construct the road, and reserves no right to
rescind the grant. It licenses their cars to run upon the road
for ten years from the time it shall be opened, at a stipulated
fee for each car; and provides that if the parties fail to agree
upon the amount to be paid for licenses, at the expiration of
that period the railroad, with all the equipments thereto be-
longing, shall be surrendered to the corporation at a fair and
just valuation. Can it be that a contract containing such pro-

visions may be rescinded at the pleasure of the corporation? The very contingency, upon the happening of which alone the parties seem to have contemplated a termination of the contract furnishes the strongest evidence that the grant was intended to be perpetual. I agree with Mr. Justice Bosworth, that "it would be an anomaly if, after the grant had been made and accepted, and the road built in every respect in conformity with the terms of such a grant as is contained in the resolution in question, the common council may rescind the grant and divest the rights acquired under it, precisely as they may order a street to be widened or extended, or repeal any police ordinance or regulation." The same view is expressed by Mr. Justice Strong in the opinion delivered by him upon the motion for an injunction in this cause. After referring to the prominent features of the resolution, that learned judge says: " Surely all these provisions indicate something more than a mere revocable license. They convey a valuable right, which, upon the performance of the primary acts required from the defendants, would vest in them, and of which they could not be deprived by a repeal of the resolution." Mr. Justice Duer, too, in the very able opinion recently delivered by him upon the decision of a kindred action, says: " I am yet to learn that a contract, valid when made, can be rescinded by either of the parties, unless the power of rescinding it is expressly reserved, or was given by some constitutional or statutory provision in force when the contract was made. The license contemplated by ·the resolution must, therefore, be regarded as perpetual and irrevocable. If it takes effect at all, the right of way now vested in the corporation, so far as it is necessary for the purposes of the defendants, will become vested in them. The exercise of the legislative powers of the corporation, in respect to that street, must be in subordination to the vested rights of the defendants. We have already seen that a corporation cannot, without the consent of the legislature, thus divest itself of its own powers. The resolution itself is, therefore, unauthorized and void."

Again, the corporation has "full power and authority to

make and pass such by-laws and ordinances as it shall from time to time deem necessary and proper to regulate hackney coaches or carriages, and their rates of fare or carriage, requiring the owners of such hackney coaches or carriages to have a license from the mayor of the city for the time being, under the directions of the common council." (2 *R. S.* 446, *sec.* 272.) It seems to have been assumed by all parties that the cars which, by the terms of the resolution, the defendants were authorized to run upon the Broadway Railroad, would be " carriages," within the meaning of the term as used in the statute. Accordingly, it is stipulated that " the associates shall pay, for ten years from the date of opening their railroad, the annual license fee for each car now allowed by law, and shall have a license accordingly." (See opinion of DUER, J., above cited; also, Drake agt. Hudson Railroad Co., 7 *Barb.* 538.) Assuming that the cars to be employed by the defendants in operating their railroad would be carriages, and as such would require a license from the mayor of the city, it is extremely questionable whether the corporation had the power to contract beforehand, as they have assumed to do, that for ten years at least such carriages or cars should be licensed. The license is to be given by the mayor of the city for the time being. The execution of this provision in the resolution would require the mayor of the city, whoever he might be, and without any reference to his own judgment or discretion in the case, to issue a license for all the defendants' cars. In stipulating for this, I think the corporation has transcended its authority. But, without insisting further upon this point, I think the more fatal objection upon this branch of the case is that the corporation has undertaken to deprive itself of the power conferred upon it by the legislature, in the section of the statute above cited, " to regulate rates of fare or carriage." The associates of the Broadway Railroad are, by a provision in their contract with the corporation, authorized to demand and receive from every passenger whom they may carry from one point to another, *five cents*. Although the legislature has declared that the corporation shall have the power and authority, from time to time, to regulate

the rates of fare to be charged for the carriage of persons, the corporation has said, by this resolution, that in respect to the carriages which may be employed by the defendants in operating their railroad, that power shall never be exercised. This it could not do. The members of the common council by which this resolution was adopted were not authorized thus to invade the legislative power of their successors.

This objection, in a practical view, at least, derives great force from the *exclusiveness*, which is a characteristic feature of the grant. Whether it was intended or not, it is obvious that if the grant takes effect at all, it must operate as a perpetual monopoly. Its privileges are perpetual, or if not, can only be extinguished on the refusal of the grantees to pay such license fee for their cars as the corporation shall exact, and then only upon full indemnity on the part of the corporation. Practically, at least, they are exclusive, too; no one will seriously contend that the corporation would have power to authorize the use of the defendants' track by any person against their will. And although the abstract right to lay another track might exist, yet in fact, the thing would be impracticable; so that the defendants, if they can secure the benefit of their grant, have secured a perpetual monopoly of the privilege of carrying passengers by railroad in Broadway.

What if the corporation, for a consideration deemed adequate—as, for the sake of the comparison, the sweeping and cleansing of the street—had granted to the proprietors of a single omnibus line the privilege of running their carriages forever in Broadway, with the right to charge a specified sum as fare, without reserving the right to regulate such fare—would any one hesitate to say that the corporation had transcended its power in making such a contract? Suppose, further, that the fare which the corporation had thus authorized the omnibus proprietors to exact had been *ten cents* for each passenger, when it was known that the other proprietors were willing to perform the same service for *six cents*, would it not be insisted that, besides going beyond its authority, the corporation had been guilty of a wanton breach of duty? And then, if the

feature of exclusiveness were added to the grant, so that the favored proprietors might enjoy a perpetual monopoly of the carriage of passengers upon Broadway by omnibus, could any tribunal fail to declare the grant illegal and void? The impropriety of such a grant might be more glaring, but, upon principle, I cannot see that it would be more objectionable than that under consideration.

An attempt was made to give perpetuity to the association to be formed under the provisions of the resolution by declaring that, in case any associate should die, or do any act whereby his interest in the association should vest in another, the association should not be deemed to be thereby dissolved, but that the successor in interest should stand in the place of the associate to whose interest he had succeeded. I do not think the object of the parties could be effected in this way. I am not aware of any rule of law which would bind the legal representatives of an associate in case of death, or the assignee in case of insolvency, to become a stockholder, standing in the place of the associate to whose interest he had succeeded. In such a case I suppose he would have the legal right, as in any other unincorporated association, to have the business closed up, and to receive his share of the assets. But, whether this is so or not, I cannot see that this provision can vitiate the grant itself. It is in no respect necessary to support the other provisions in the resolution. Though inoperative, as I think it would be, the other provisions in the resolution might very well stand without it, if otherwise unobjectionable.

Nor do I think the resolution a violation of the provision in the charter which requires that contracts for work to be done, shall be made by the appropriate head of the executive department. This provision, as I understand it, only relates to contracts which would involve a liability to pay for the work to be done. An agreement, as in this case, to sweep and cleanse a street, not for a compensation to be paid, but as the condition upon which the privileges specified in the contract are granted, may, as it seems to me, very well be made by the common

council itself, without the intervention of any of the heads of departments.

Having come to the conclusion that the resolution in question is not within the powers conferred upon the common council, and is, therefore, void, I have not felt myself called upon to examine the questions of fact presented by the pleadings, and to which the evidence presented upon the trial was directed, with the care which their importance would otherwise require. As to the effect of the proposed railway, a great diversity of opinion evidently exists among the citizens of New-York. A large number of witnesses, among whom are gentlemen in whose judgment on such a subject I should have great confidence, are of opinion that it would be a great public benefit, and in no respect injurious; while quite as many more, upon whose opinions I should quite as willingly rely, think the proposed railway would prove a nuisance not to be endured. Under these circumstances, I should not feel myself justified in declaring that the construction of the road would create what, in legal effect, would amount to a public nuisance; yet I may be permitted to add, I am not without strong apprehension that it would prove greatly injurious to the owners of property, especially in the lower portions of the street. I am inclined to think the weight of the evidence tends to this conclusion.

In respect to the circumstances under which the resolution was adopted, I do not think the evidence would warrant the conclusion that the members of the common council who voted for the resolution were governed by corrupt motives or acted in bad faith. And yet the pertinacity with which they persisted in conferring upon these defendants privileges so extraordinary in their character, and which are supposed at least to be of so very great value, is calculated, it must be conceded, to excite a lively suspicion. Other propositions, apparently much more favorable both to the corporation and the public in their terms, were before them. That they should reject these, and adopt the proposition of the defendants, can only be accounted for if the members of the common council who voted for the resolution are to be acquitted of dishonesty upon the theory as-

sumed by the counsel for the defendants upon the argument, that they had no confidence in the good faith of those who made the propositions, inasmuch as they were avowedly opposed to the enterprise.

But, whatever may have been the motives which induced the members of the common council to support the resolution, they transcended their power, and, therefore, even though it may have been unintentional, were guilty of a breach of duty. They had no right to make the grant contemplated by the resolution, and having attempted it, they were chargeable with a violation of official trust.

The only other question which I deem it useful to notice is, whether the plaintiffs are entitled to the remedy for which they ask? The corporation had assumed authority to grant permission to the defendants to lay in Broadway a railroad track. By virtue of such permission, and yet without legal authority, the defendants were about to proceed to the execution of their purpose. The illegal act thus about to be committed would, if consummated, result in special, and perhaps irreparable injury to the plaintiffs, and others, who, like them, are owners of real estate situated upon Broadway. Besides their interest in common with other corporators and tax payers, they had this other special and more important interest to be affected by what might be done by the defendants under their pretended license from the corporation. Upon this state of facts I cannot doubt that the plaintiffs are entitled to an injunction. The act about to be committed by the defendants was unlawful, but whether it would amount to a public nuisance may, as the evidence in the case stands, be questionable. But whether a public nuisance or not, it would, I have no doubt, prove injurious to the property of the plaintiffs. If so, whatever the public rights may be, they are entitled to have such unlawful act restrained. A nuisance may be both public and private. To the individual who has sustained actual damage as the result of the wrongful act it may be regarded as a private nuisance, even where the party chargeable with such wrongful act might also be convicted of a public nuisance.

(See First Baptist Church, &c. agt. Schenectady and Troy Railroad Company, 5 *Barb.* 79, *and cases there cited.* *See also Code* § 219; Christopher agt. The Mayor of New-York, 13 *Barb.* 567.) In the latter case it was held that where an act is clearly illegal, and the necessary effect of such act will be to injure the property of another, the court is warranted in restraining the illegal act by injunction. The plaintiffs present such a case. The act sought to be restrained, as we have already seen, is wholly unauthorized and clearly illegal. The effect of the act, if committed, would be injurious to the property of the plaintiffs. I am, therefore, of opinion that the injunction should be made perpetual.