## PETERSON *v.* THE MAYOR, &c., OF NEW-YORK.

The common council of the city of New-York having the general power to build markets, is authorized to employ an architect to prepare plans, specifications, &c., for their construction.

A resolution adopting the plans, working drawings, &c., prepared by an architect, at the request of a committee not empowered for that purpose, and directing the erection of a market according to such plans, &c., the resolution being passed with notice of the facts, is a ratification as effectual to bind the city as an original employment by express resolution.

The building of a new market not being among the duties of any of the executive departments, under the amended charter (*ch.* 187, *of* 1849), that act does not invalidate the awarding of a contract therefor, by the common council, to an individual, for a specified sum.

APPEAL from the New-York Common Pleas. The action was brought to recover for the labor and service of the plaintiff in preparing certain plans, specifications and working drawings for the erection of a new edifice for the Washington market, in that city. The defendant put in issue all the material allegations in the complaint.

On the trial, before Judge INGRAHAM, in 1853, the following facts appeared in evidence : The committee on markets, of the board of aldermen of New-York, in 1851, had before them for consideration, the subject of rebuilding Washington market, upon the reference to them of a communication of the mayor. A member of the committee employed the plaintiff to draw the plans, &c., and they were drawn under his direction, with the concurrence of the committee. They were very elaborate and complete, going into great detail, and employed the time of the plaintiff for several months. When completed, the committee presented them to the board, with a report recommending the erection of the building according to these plans, and advising that the commissioner of repairs and supplies should be directed to ascertain the cost of such a building. Such directions were accordingly given to the commissioner, by a resolution of the board of aldermen; the plans were delivered to him, and that officer reported to the board, that he had advertised for estimates for the building, and he communicated a list of those which he had received, among which was one from John B. Corlies, for $375,500, for the entire work. This report was made on the 11th of August, 1851. On the fourteenth of October following, the board of aldermen adopted a resolution, that Washington market should be rebuilt according to the plans and specifications prepared by the plaintiff (which were declared to be adopted, with

a single change, mentioned in the resolution), under the direction of the commissioner of repairs and supplies, and the superintendent of public buildings, and such assistants as they might select; it declared that the contract should be given to John B. Corlies, "he being," as it was said, "the lowest bidder for said work." The resolution also appropriated $375,500 therefor, to be raised by loan, pursuant to an act of the legislature, which is referred to. (*Laws of* 1851, 589.) It directed that the building should be commenced in the month of February then next.

This resolution was soon after concurred in by the board of assistants. It was vetoed by the mayor, but was again passed by a majority of the members of both boards, notwithstanding his objections. It did not appear that anything had been done towards the erection of the building. The plaintiff then gave evidence respecting the value of his services, and rested. The defendant's counsel moved for a nonsuit, on the ground that the committee on markets of the board of aldermen had no authority to employ the plaintiff, and the judge thereupon ordered a nonsuit. The judgment having been affirmed at a general term, the plaintiff appealed.

*James T. Brady*, for the appellant.

*Nicholas Hill*, for the respondent.

DENIO, J. The Court of Common Pleas decided correctly in holding that a committee of one of the boards of the common council had no right to employ the plaintiff to perform these services. The board of aldermen had not itself the right of its own authority to bind the city to payment for such services. That board was simply a branch of the common council, and its action, to be effectual, required to be concurred in by the other board, and to be presented to the mayor for his approval. (*Laws of* 1830, 125, §§ 1, 12;

*Laws of* ·1849, 278, §§ 1, 4, 6.) But the common council adopted the plans, estimates and drawings which the plaintiff had prepared, and put them in use by making them the basis of a resolution providing for the erection of such a building as was contemplated by them. We are then to determine upon the effect of this act of the common council. In order to attribute any legal consequence to it, we must be satisfied that the business was within the scope of the authority of the council, and that it could originally have employed the plaintiff to perform the services for which he claims compensation. It cannot, I presume, be doubted but that the council, as the local legislature of the city, was competent to determine upon the policy of rebuilding the market, and causing it to be done, if so determined upon. The act authorizing the raising of money for building purposes, by loan, directed that the funds to be so raised should, in part, be expended for the erection of such additional public buildings as might from time to time be required for the use of the city. ·(*Laws of* 1851, 590, § 3.) The franchise of holding and keeping markets at such places as should be established by the common council, was expressly granted by the Montgomerie charter (*Kent's Charters*, 100, § 17); and the learned author, in the treatise on the powers and duties of the corporation, says, that on this general authority the power over markets ·rests at this day. (*Id.*, 239.) This power is understood by the legislature to embrace the erection of market buildings. It was so assumed in an act passed in 1822, by which the mayor, aldermen and commonalty were authorized, in case they should find it necessary, to cause public markets to be erected over the waters of the East and North rivers, adjoining to any of their docks or wharves. (*Ch.* 101.) In *Ketchum* v. *The City of Buffalo* (14 *N. Y.*, 356), this court recently determined that a power conferred upon a municipality "to establish and regulate markets," authorized the purchase of ground upon which to erect a market building. It was incident to

the general power to build a market, to determine upon the form, dimensions and fashion of the edifice; and I suppose no public body or private person would enter upon an important and expensive work of this character without having plans, drawings, specifications and estimates laid before them. I cannot doubt, therefore, but that it was entirely within the province of the council to employ a person of professional skill to perform the services for which the plaintiff claims compensation, unless restrained by some positive provision of law. Of the alleged restraints upon this power, I shall hereafter speak.

Assuming then that these services might have been lawfully performed at the expense of the city, by a person directly employed by resolution of the common council, and that they have, in fact, been performed by the plaintiff, under an officious employment by a committee of one of the boards, the question is, whether the adoption of the plans, and using them to the extent which has been shown, binds the city to pay for them. As regards individuals, the principle is familiar, that if one with a full knowledge of the facts, ratifies the doings of another who has assumed to act in his name and behalf, he will be bound thereby as fully as if he had originally conferred authority upon him in the premises. This ratification may be by express assent, or by acts or conduct of the principal, inconsistent with any other supposition than that he intended to adopt and own the act done in his name. ( *Story on Agency*, §§ 239, 252.) I am of opinion that the principle is as applicable to corporations as to individuals. Chancellor KENT says, the doctrine that corporations can be bound, by implied contracts, to be deduced by inference from corporate acts, without either a vote or deed or writing, is generally established in this country with great clearness and solidity of argument. (2 *Comm.*, 291.) The cases of *The Bank of Columbia* v. *Patterson* (7 *Cranch*, 299); *Bank of the United States* v. *Dandrige* (12 *Wheat.*, 74); *Perkins* v. *The Washington Insu*

*rance Company* (4 *Cow.,* 645); *The American Insurance Company* v. *Oakley* (9 *Paige,* 496); *Magill* v. *Kauffman* (4 *Serg. & Rawle,* 317), *and Randall* v. *Van Vechten* (19 *John.,* 60), sufficiently exemplify this rule. In applying it to a particular case, care must be taken that other principles of the law are not violated. For instance, no sort of ratification can make good an act without the scope of the corporate authority. So where the charter or a statute binding upon the corporation, has committed a class of acts to particular officers or agents, other than the general governing body, or where it has prescribed certain formalities as conditions to the performance of any description of corporate business, the proper functionaries must act, and the designated forms must be observed, and generally no act of recognition can supply a defect in these respects.

This leads me to consider the argument which has been submitted upon certain provisions of the amended charter of 1849. It is enacted that the legislative power of the corporation shall be vested in the common council, and the executive power in the mayor and the heads of departments, and other officers, to be created by law; and it is declared that neither the common council or any committee or member thereof, shall, with certain exceptions not very material, perform any executive business whatever. (*Laws of* 1849, *ch.* 187, §§ 1, 9.) It is argued that the resolution adopting the plaintiff's plans and directing the market to be built according to them, and awarding the contract to Corlies, at a specified price, was a violation of these provisions of the charter. I do not concur in that position. The question as to the propriety of taking down and reërecting an important public building is very clearly an act of local legislation. Executive duties are such as concern the execution of existing laws, but this act required the ordaining of a new law. To prove this, it is only necessary to show that without such law the act could not be done. The statute under consideration creates several executive departments,

and provides for electing and appointing their heads and the subordinate officers. The only one which has any relation to the present subject, is that of *repairs and supplies* which, the act declares, " shall have cognizance of all repairs and supplies of and for roads and avenues, public pavements, *repairs to public buildings,* to fire engines and apparatus of the fire department." The power to provide for the repairs to public buildings.cannot, by any fair construction, be made to embrace the authority to erect a large and expensive edifice, or in my opinion, to erect any building. The position that under this authority this subordinate department could build a new city hall or hall of records, without a vote of the common council, would be very extravagant, and yet they could do so, for aught I can see, as well as they could erect this market. It is equally an act of local legislation to fix upon the form and dimensions of a public building. Indeed, anything which enters into the idea of the plan of an edifice may properly be determined by the authority to which the law commits the duty of determining that one shall be built. It is another question as to how far the details of such an enterprise may be committed to a subordinate department. The law making power may, and frequently does, prescribe the duties of the executive upon a given subject. But the particular objection of the defendant's counsel is to that part of the resolution which awards the contract to Corlies, for a specified sum. If it should be conceded that this was an assumption of the functions of an executive department, still the determination to build the edifice, and to build it according to the plaintiff's plans and estimates, being subjects within the power of the council, would be valid acts, though the council had no right to make the contract. The adoption of the project of building a particular edifice according to a specified plan, was the substantial part of the resolution. The rest was modal. We must assume that the enterprise was entered upon from public motives, not for the purpose

of giving a job to Mr. Corlies. The objection last referred to is founded upon section twenty-three of the amended charter, which, so far as it relates to this subject, is as follows: "All contracts to be made or let by authority of the common council, for work to be done or supplies to be furnished, and all sales of personal property in the custody of the several departments or bureaus, shall be made by the *appropriate* heads of departments, under such regulations as shall be established by ordinance of the common council." I am not convinced that this provision forbade the awarding of this contract by the common council. Leaving out the intermediate words, the enactment is that " all contracts shall be made by the appropriate heads of departments." But suppose the subject of the contract does not fall within the jurisdiction of any of the departments, is the common council prohibited from making the contract? The act is susceptible of the possible construction which would forbid the common council to make any contract, and which would require that body, after determining upon the work, to refer the matter to an appropriate department to make the contract; but this is not, I think, the true construction. Certain departments were created by the act, and several subjects of administration were specified and distributed among them. Then comes the injunction that all contracts shall be made by the appropriate heads of departments. The meaning, I think, is, that all contracts relating to subjects belonging to any of the departments shall be made by the heads of these departments, and not by the common council. For instance, if repairs had been required to be made to the old market, the common council could not have made the contract, but it must have been made by the commissioner of repairs and supplies. But if we assume what I have attempted to show, that the building of this market was not among the duties of any of the departments, I am of opinion that the direction in this statute did not apply to the case. This view is strengthened by what is

said in the same section respecting the sales of personal property. Sales of such property in the custody of the several departments or bureaus are to be made by the appropriate heads of departments. But if the city had such property, which was not in the custody of any of the departments or bureaus, the power of the common council over it would not be impaired by this provision. The general purpose of this section is to forbid the common council from interfering with the proper business of the departments.

It appears from the opinion of the court in the case of *Christopher* v. *The Mayor, &c., of New-York* (13 *Barb.*, 567), that an ordinance had been adopted by the common council upon the subject of the letting of contracts and the issuing of proposals for estimates where work was to be done for the city. It was not given in evidence upon the trial of this case, nor is its precise language stated in the case cited. We express no opinion upon its effect in the present case, if it shall be proved upon another trial, nor upon the correctness of the decision in the case of Christopher *v.* The City.

It is suggested in the opinion of the Court of Common Pleas that the adoption of the plans by the common council should not bind the city to pay for them, for the reason that the resolution does not appear to have been passed with a full knowledge of the facts connected with the plaintiff's employment to make them. They were brought to the attention of and delivered to the council by a committee of one of the boards who had the matter in charge; and the fact that the plaintiff made them is stated in the resolution. They were not made under any special contract, but under a general employment of the plaintiff by the committee. I think the jury might have properly found that the council were cognizant of all the facts which existed. It is true, as suggested in the opinion, that the plaintiff may have rendered his services in consideration of

the prospective advantages of an employment as architect, if the work should be prosecuted, and that he was not to have anything if it was abandoned.   But if there was any evidence of this, and I cannot discover any, it certainly was not so clear that the court could come to the conclusion as a matter of law.   The plaintiff was entitled to have his case submitted to the jury.

These views, if sound, require the reversal of the judgment of the Court of Common Pleas and a new trial.

ROOSEVELT, J., dissented; all the other judges concurring,

Judgment reversed and new trial ordered.