Neilson, J.
The contract in question was in proper form, and was duly executed, unless the circumstance that the trustees, by whom it was subscribed, affixed their private seals, instead of the common seals of the parties, be an objection.
The common seal, affixed to the written undertaking of a corporation, gives an assurance of authority, and of a consideration. But the presumptions arising from the presence of the seal may, in its absence, arise from the proofs. We have reduced the metaphysical conception, that a corporation could only speak or declare its will by the common seal, to a mere "question of evidence, and have assimilated the freedom of expression to be imputed to a body corporate, through its agents, to that possessed by a natural person. As to both, we apply the rule that a seal unnecessarily used by an agent may be disregarded (19 Johns., 60; 4 Wend., 285 ; 5 Id., 572 ; 30 Barb., 218; 8 N. Y. [4 Seld.] 160; 19 N. Y., 305; 1 Harr. & Gill, 413; 7 Cranch, 299; 8 Wheat, 338).
The informal manner in which corporations, proceeding in their legitimate operations, may become bound, as natural persons may become bound, has been largely illustrated in cases where the courts have resorted to presumptions, or to the principles peculiar to the election, assent, adoption and ratification by parties of their transactions. Many of the implied engagements of corporations, not otherwise obligatory, have been thus defined and enforced (15 Barb., 323; 17 N. Y., 449 ; 19 Id., 207; 5 Hill, 137; Hill & Denio’s Supp., 398).
As a corporation can only contract in respect to and manage its business and property by agents, whether the common seal be used or not; as it can declare its will through those agents with more clearness and certainty than by the use of any sign or symbol, however significant by reason of the fiction imputed to it, there *488 are few occasions when the common seal need be used. By applying to a corporation the rules of law which govern principal and agent, in their dealings with third persons; by holding them to the natural laws which a,re known to influence human conduct, and by reject ing theoretical distinctions between artificial and nat ural persons, the gradual course of judicial develop ment has given us a clear and intelligible system. As a general rule, a corporation, within its a >propriate sphere, may contract when and *s the .Azen might contract, in reference to the same matters.
It follows from these general views that the agreement in question in this action was well executed without the common seal; and that, as no seal whatever was required to a mere contract for the purchase and sale of real estate, the private seals used do not affect the instrument.
Moreover, it is well understood that a corporation may adopt, for the time or occasion, any seal.
The defendants’ «acceptance of the four thousand dollars paid by the plaintiffs, was an adoption of the contract.
It is claimed that this contract was ultra vires, as, in unconditional terms, it was for the. sale' of real estate by a religious corporation, the consent of the court not having been previously obtained.
A religions corporation has the title to its real property, may determine when it should be sold, and has the sole and exclusive power to enter into contracts for that purpose. The only distinction which exists between its power of alienation and that possessed by other corporations, is, that the consent of the court is necessary.
It is true that the statute in terms requires that con • sent “for the sale,” but, it is equally true that the statute does not, in terms, or by necessary implication, restrain the making of a contract as a preliminary step *489 towards such sale. Such an enactment, like other restrictions' impairing what otherwise would be a common law right, is to be construed and applied with strict regard to the intention of the legislature. In this instance the intent was to protect the members of the church or society—the corporators, the real parties in interest—from the perversion of the property. The granting of the land was the act to which this restriction was directed. Hence it has been held that the application might be for a consent to a conveyance, and that an order, in that form, was proper. ' The liberal sense in which the phrase “ for the sale” may be thus taken, is consistent with the statute, and with accepted rules of interpretation. It is quite apparent, therefore, that full effect is given to the intent of the legislature, and to the claims of the corporators if, at any time before the actual conveyance is given, the supervision of the court is invoked and the consent obtained (7 Paige, 77; 6 Bosw., 245; 1 Abb. Pr. N. S., 214).
It is claimed, however, that the contract, if not preceded by the consent of the court to the sale, should contain a promise or condition as to its being granted.* Such an undertaking was expressed in the contract approved in Bowen v. Irish Presbyterian Congregation of New York (6 Bosw., 545). That mode of contracting is prudential. But these parties, with knowledge that that consent was necessary, entered into this agreement, contemplating that, in due time, the proper order would be granted. The purpose of both parties *490 being just and reasonable, beyond criticism, and approved by their corporators, there was no reason to apprehend that the court would hesitate to grant that consent. It became the duty of the defendants to make the application before the day fixed for the delivery of the deed. That duty would not have been more imperative had it been expressed in writing. If the defendants had neglected that dtity, and if the plaintiffs had come forward prepared to make the payment, and to accept the deed, a specific performance could have been compelled. In view of the meritorious character of the arrangement, a court of equity would have made a summary disposition of that question, and could have supplied the omission, or regarded that as done which should have been done.
This contract contained all the necessary provisions ; the description of the property, the price, time for the payment and conveyance, fully, and in detail.
What remained, however, taking the objection in terms, related to the defendant’s ability to carry out the proposed sale. It is claimed that the agreement should have treated of that also. I am not aware of any adjudication, or principle, applicable in support of that view. There have been several cases in the courts in England where railway companies, under express restraints as to the extent of their lines or the purchase of land, have undertaken to contract upon the express condition that an act of Parliament could be obtained, authorizing the scheme. In such cases, there being want of power, want of interest in the subject matter of the contract, and the action of Parliament being uncertain, there was special occasion for making the agreement conditional.
It is apparent that such cases have no application to that under consideration. The answer to the objection urged is that when a party who has the title to the property to be conveyed, and has common law *491 rights in respect to its sale, enters into an agreement not contrary to public policy, his ability to carry out the undertaking, or the special acts to be performed by him in perfecting that ability by procuring some consent or license, need not be specified in the agreement. He is to give a good and sufficient deed of conveyance, and, as an incident, is bound to do whatever is necessary to that end. A known and well defined duty, under the contract and this statute, devolved upon the defendants. As its observance was possible, was necessary to enable them to cary out their engagement, they .were bound to that observance, although the contract was silent on the subject.
No right or interest was affected by that silence. Who would suffer \ Not the plaintiffs, as a court of equity could give protection: not the defendants, as they may be assumed to have promised to obtain that consent: not the corporators, as they were not deprived of protection ; not the spirit of the statute, as there was no attempt at an evasion. Whether expressly recognized in the contract or not, the necessity of the consent of the court would be present and be recognized when the time came for executing and delivering the deed.
It follows that, to save a meritorious agreement, the defendants’ undertaking to obtain the proper order in respect to the conveyance, would be implied. That would not be extending or modifying the contract— would not lessen the rights of the one party or increase the obligation of the other. It would be imputing the proper motive, assuming that they intended to respect the statute. The principle I am suggesting was had in mind by Maulé, J., when he said to counsel (83 Eng. Com. Law, 626), “Can you state as a proposition of law, that there cannot be a legal transfer % . . And, if there may, must it not be understood that the parties contemplate a transfer by legal means Y *492 So also, by Erle, J., in Mayor, &c. v. Norfolk Railway Co. (30 Eng. L. & Eq., p. 127 of op.), when lie said, as he might if speaking to this case, “ The rule of construction above mentioned has been frequently recognized. I cite two cases in which it was applied under analogous circumstances—Sewell v. Royal Exchange Assurance Company, 4 Taunt., 456, and Haines v. Bush, 5 Id., 521,—where the contracts were for voyages that were prohibited and unlawful, but might have been made lawful if licenses were obtained : the contracts did not stipulate that licenses should be obtained, but the court held that the contracts must be construed to mean voyages with licenses, as that construction would make them valid.”
So also, by Pollock, C. B. (8 Exch., 922), noticing the time of performance to be imputed, ‘£ There is another maxim of law, viz : that every reasonable con dition is also implied.”
There is no substantial difference between the contract approved in the case in the sixth of Bosworth, and that now in question. The same principle governs both, and, if the consent of the court to the conveyances had been withheld, both contracts would have been inoperative. But, such consent having been given, the ■ contingency was removed. Such contingency was very slight, however, as compared with that which existed in the cases adverted to, where an act of Parliament was necessary to enable railway companies to contract: —the action of Parliament being uncertain, the action of the court certain. No number of wise men could • tell what Parliament might do ; any discreet lawyer could, upon this contract and petition, have said what the court would do. What would have been the creation of power,—the granting of a privilege—in those cases, would merely have been consenting to the exercise of a clear right in this case. This was a valid contract, liable, like many others, to be defeated, but the *493 question as to its force or effect, independently of the order of consent obtained, is of secondary importance. The proposition settled in Eastern Co. R. R. Co. v. Hawkes (35 Eng. L. & Eq., 8), would, if need be, apply. “ The mere want of legal power to make the contract at the moment of entering into it, will not affect its validity afterwards.”
The basis for the doctrine of ultra vires, in the proper sense,.is wanting here. That plea presupposes an abuse of authority; a breach of trust. It is most properly set up by shareholders or beneficiaries against directors and trustees acting inconsistently with the purposes of their appointment and of the powers delegated to them, and, with some exceptions as to third persons acting in good faith, and entitled to protection, may be set up by the corporation. But, even then, that plea by the corporation proceeds upon the ground that the act sought to be avoided is prejudicial to the corporators. This doctrine “ does not receive favor with the courts” (per Monell, J., 1 Abb. Pr. N. S., 227), is to “be confined within narrow bounds” (per Lord St. Leonards, 35 Eng. L. & Eq., p. 31 of op.); and the character and proper application of it were with great force and felicity illustrated by Comstock, Ch. J., in Bissel v. Michigan Southern & N. I. R. R. Co. (22 N. Y., 258.
If the defendants had assumed to convey this property for an improper purpose, or without the consent of the court, that would have been ultra vires. But in this mere contract for the sale of it, there was nothing savoring of a breach of trust, no taint whatever, and the objection is not well taken.
It is further urged that the trustees had no power to extend, the time for the delivery of the deed. It would seem that extension was for the benfit of the plaintiffs ; it was an act incidental to the general duty with which the trustees were charged in respect to this sale.
*494 I think, therefore, that the deed was tendered, and demand of payment made, at the proper time.
It is also objected that the order of the supreme court, consenting to the sale, had not been filed and entered in the clerk’s office prior to that tender and demand. That was a matter of form. If the deed had been declined on that ground the papers could have been filed at once; a mere clerical duty (53 Barb., 412).
Also, that, in addition to the mortgage for twenty thousand dollars, which the plaintiffs were to assume, a mortgage for fifteen thousand dollars had been given. But the satisfaction of that additional mortgage had been obtained, to be delivered if desired. The deeds tendered gave the plaintiffs the option to accept one, therein assuming the fifteen thousand dollar mortgage, in which case the satisfaction piece could have been returned to the insurance company ; or, to accept the other and execute a new mortgage for the fifteen thousand dollars according to the contract, in which case the satisfaction would have been entered. Again, it is to be said that the plaintiffs did not decline to proceed on those grounds. Objections which might" have been obviated should have been stated; though insuperable objections are not waived by silence. But it appears that they declined for want of means.
On the whole, I am not able to find, either upon principle or authority, that the plaintiffs are entitled to be relieved from the contract, and to recover back the moneys paid.
The defendants’ claim for judgment against the plaintiffs for fifty-one thousand dollar’s, the residue of the purchase price, must be overruled.
In such case, and upon a mere executory contract, the vendor is entitled to recover of the purchaser in default the damages arising from the breach, but nothing more. No such damages have been shown. There has, *495 indeed, been'the loss of interest on the money unpaid, but it cannot be assumed that the use of the property, whereof the defendants have remained in possession, has not been equivalent to that loss of interest (3 Wend., p. 405 of op.).
In Richards v. Edlck (17 Barb., 269), Mr. Justice Gridley, at special term, the case coming up on demurrer, reluctantly accepted the doctrine that, upon such default, the vendor might recover the unpaid price of the land contracted to be sold. He cites two cases in the Tern Reports, decisions not now followed by the courts in England. He also refers to cases (5 Cow., 506 ; 9 Wend., 399 ; 2 Johns., 207 : 10 Id., 266; 20 Id., 130; 11 Wend., 48; 21 Id., 636, 457), in which he considered that the right of the vendor to recover the price, and not mere damages, was recognized.
In the case in Cowen, the plaintiff’s claim for the price was allowed without discussion, and on the review the attention of the court was devoted to other questions. One of the cases in 21 Wendell was as to personal property. The other cases turned upon questions as to the title, the tender of the deed or of the money, the admissibility of evidence of fraud to impeach a specialty : and some of them, like the case before Mr. Justice G-ridley, upon the sufficiency of the pleading. In three of the cases in Johnson’ s Reports, the demurrers to the declarations were sustained on special grounds.
It is evident that no case, coming up on mere demurrer to such a pleading, could determine the rule; the question raised being whether any cause of action existed, rather than as to the amount which should be recovered. It would be everywhere confessed that the vendor of lands, who had kept his contract, could have his action against the purchaser in default. A defendant, not liable for damages on the facts presented by the plaintiff’s narration, might well put in a de *496 murrer. A defendant thus liable for any amount, the purchase price or less, would not be advised to demur. It would seem, therefore, that Mr. Justice Grxdley might well have refrained from stating the rule as to the extent of the purchaser’s liability.
In the text-books conflicting opinions have been expressed by writers, but Mr. Parsons approves of the rule, as settled by the courts in England, that the seller recovers mere nominal damages, unless the land has declined in value (3 Pars, on Cont., 231). But if the lands had not thus declined, and were unproductive, the interest on the money which should have been paid, as well as the reasonable expenses, would go to enhance the damages. The principle is one of mere indemnity : the inquiry—how much has the vendor suffered by the default of the proposed purchaser % In Laird v. Pim (7 Mees & W., p. 474 of op.), Parke, B., states the grounds of the limitation thus : “The vendor “cannot have the land and its value too and in the Eastern Railway Co. v. Hawkes (35 Eng. L. & Eq., p. 25 of op.), Lord Campbell says, that the vendor can only recover the difference between the stipulated piice and the price which it would probably fetch, if resold, together with incidental expenses, and any special damages which he may have suffered; and Lord St. Leonards makes a like statement (p. 34 of op.).
In this last case, those distinguished jurists were contrasting the equitable with the legal remedy—-the specific performance, where the vendor wants the contract price, carrying out his purpose, when the action at law would not. The objections which exist to the vendor’s recovery of the full price, while he still has the land, with the power to mortgage or convey it to another for value, do not apply to the equitable remedy. In the case of specific performance there could be no perversion of the property. The seller comes into court, saying, “Take the land, and give me the *497 moneya mere exchange, under judicial supervision.
As a general rule, it would not be wise or just to allow the vendor, holding such an executory contract, and also holding the title to and the possession of the land, to recover the whole price, as if "the title had passed or could pass by operation of law. The money might be extorted on final process, and the unfortunate purchaser never get the land. The rule that shall best guard against such results is the most just and reasonable ; the most consonant to the equitable qualifications which have entered largely into our law of real property.
Without pausing to state other familiar illustrations, it may be asked, Why is it that, having accepted a deed with full covenants, the title bad, I must lose the contemplated profit which induced the purchase— must lose the money expended in large improvements, before discovering the want of title \ Simply because otherwise the grantor, who conveyed in good faith, might be utterly ruined. Or, finding the estate incumbered by a mortgage for fifty-one thousand dollars, contrary to the covenants in the deed, why may I not have judgment against my grantor for that amount, the mortgagó still outstanding % Simply because, having got the money, I might never pay the mortgage. A like spirit of equitable prevision would lead us to emphasize the statement of Baron Parke—the vendor cannot have the land and its value too.
The justice and propriety of this rule could not be disturbed by attempting to assimilate such a case to cases arising on other contracts, or in respect to personal property. There, as here, the law is characterized by a reasonable regard for the interests of the party chargeable with a broach; and the fair protection and indemnity of the other party is the general rule.
*498 Thus it is that the actual damages are preferred to a gross sum, put as liquidated damages, whenever the terms of the covenant will permit that one employed to labor, and discharged, cannot refuse other proper employment and recover the wages fixed by the contract; that one to whom freight was to have been furnished in a foreign port, could not refrain from taking other like freight, let his ship come home empty, and claim the ' stipulated rate of payment in full.
Where, by reason of the unlawful conversion of personal property, the owner recovers the full value, or, on a sale, the vendor the contract price, the title to the property passes to the other party. If such legal effect could follow the vendor’s recovery of the price to be paid for land ; the contracting purchaser, on satisfying the judgment, be invested with the proper title, in execution of his contract, the objection to such recovery would be obviated. •
It is admitted that one contracting to pay a fixed price for an article to be manufactured, is liable for that price on the article being tendered to him, but that is no indication of the general rule.
On the whole, it will be found, I think, that the analogy between the cases of recovery for lands and for personal property, however particularly followed out, would not militate against the principle I have stated.
In Sawyer v. McIntyre (18 Vt, 27), the general rule is said to be that the loss of the bargain constitutes the proper rule of damages, because the property never passed (12 N. Y. [2 Kern.], p. 48 of op.; 4 Id., p. 581 of op.; 20 Conn., 38).
There has been some conflict between the courts of other States upon this question.
In Alna v. Plummer (4 Greenl., 258, an action on contract to purchase a pew, held that the price could be recovered and the title claimed afterwards.
*499 In Tripp v. Bishop 56 Penn., 424), the deed had been deposited at defendant’s request, and the court instructed the jury to find a verdict for the balance of the purchase monQy, which was affirmed, but, it would seem, without that point having been contested.
In Whitside v. Jennings (19 Ala., 784), the court was inclined to a like view, but at the close of the opinion, Mr. Justice Golem aw said, “It is unnecessary for this court to express an opinion on this point, because, if the court erred, as insisted on, the error resulted to the benefit of the defendant.” In that case reduced damages had been found.
In Old Colony R. R. Corporation v. Evans (6 Gray, 25), Mr. Justice Dewey notices the conflict of opinion, and says (p. 35 of op.), “Upon more full consideration of the question of the measure of damages in an action at law, where the defendant has refused to receive the deed tendered to him, the court are of opinion that the proper rule of damages, in such a case, is the difference between the price agreed to be paid for the land and the saleable value of the land at the time the contract was broken.”
It has been said that in States where law and equity powers are combined in the same court, the objection to allowing such price to be recovered might not be so formidable as elsewhere; but there is nothing in the suggestion. Where the claim is presented, as in this instance, the true measure of liability must be adopted, whatever it may be. So also, if the action were brought for such price, and the contracting purchaser were in default for want of sufficient means, and therefore unable to claim a specific performance, our equity powers would not enable ns to qualify the verdict.
It might well be suggested, however, that where the courts are open to the vendor to claim specific performance, it would be desirable if he could obtain the whole price only by resorting to that remedy for an enforced exchange of the land for the money.
*500 With us, if we lay out of view a case in the superior court of Hew York, mentioned by Mr. Sedgwick, in his work on damages (p. 305, 5 ed., note), the question had not received deliberate consideration by the courts prior to the case of Richards v. Edick (supra). It would seem, therefore, that Mr. Justice Grideey might well have regarded the question as remaining open for consideration, and determined that case according to his own convictions.
But in 1863, about ten years after the decision of the Richards case, the question was determined in Wilson v. Holden, (16 Abb. Pr., 133). Mr. Justice Ingraham states clearly, and without hesitation, that the vendor recovers of the defaulting purchaser the damages, as distinguished from the price.
It may be said that these defendants, by tendering the conveyance, have performed the agreement on their part. But that was necessary to protect themselves, and to lay a foundation for damages should the property decline in value. They still owned the land, and, in view of the plaintiff’s default, might have sold it to other parties.
The remaining question arises upon the plaintiff’s reply to the answer. The learned counsel for the plaintiff claims that the defendants should have proved that they had the title to their property. If the counterclaim set up could be allowed, that point would deserve consideration, as it certainly would had the action been brt aght tó recover the unpaid consideration, and the answer had raised the question as to the title. But by this complaint no such issue is tendered, and the vendor, to resist the claim of the purchaser to recover back what has been paid, need not prove his title, unless the same has been in some degree impeached, and the issue joined casts upon him that burden.
The complaint must be dismissed, but without costs.

 Cowdrey v. Carpenter (1 Robt., 439), in which it was held, that an agreement to pay a sum as liquidated damages in case a court, in which an action was then pending, should fail to make an order containing a specified provision affecting substantial interests, was void, was reversed in the court of appeals, on the ground that such an agreement was neither contrary to public policy nor void as being in the nature of a wager.