VAN ARSDALE v. JUSTICE, Comptroller, et al.

(Supreme Court, Special Term, Erie County.  February 20, 1912.)

1. MUNICIPAL CORPORATIONS (§ 223*)—PROPERTY—ACQUISITION—PURPOSE—SCHOOLS.

Under Laws 1909, c. 84, § 1, authorizing the city of Buffalo to issue bonds to raise money to construct and equip new school buildings, the city is authorized to purchase lands upon which to construct and equip such buildings.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 616–622; Dec. Dig. § 223.*]

2. MUNICIPAL CORPORATIONS (§ 240*)—CONTRACTS—ACCEPTANCE OF PROPOSAL.

The common council of the city of Buffalo, with the approval of the mayor, directed the comptroller to advertise for proposals for a high school site. A proposal was received for the sale of a certain site, which the common council, over the mayor's veto, directed the comptroller to purchase, and to draw a warrant therefor. Held, that this constituted a binding enforceable contract between the owner of the land and the city.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig § 672; Dec. Dig. § 240.*]

3. MUNICIPAL CORPORATIONS (§ 897*)—FISCAL MANAGEMENT—WARRANTS—PRIORITY.

The fact that the common council of the city of Buffalo had directed the comptroller to issue more warrants against a certain fund than could be paid out of the balance in that fund does not excuse the comptroller from issuing the warrant first authorized by the common council, since it would be payable first, especially where the mayor vetoed resolutions directing the issuance of junior warrants sufficient to bring the total down to an amount less than the balance of the fund.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1881, 1882; Dec. Dig. § 897.*]

4. MUNICIPAL CORPORATIONS (§ 897*)—FISCAL MANAGEMENT—WARRANTS—PROVIDING FUNDS TO MEET.

The comptroller of the city of Buffalo had no right to refuse to issue a warrant as directed by the common council, on the ground that the amount in the fund directed to be drawn against was not sufficient to meet all of the warrants, where bonds sufficient to meet all outstanding warrants had been authorized and were actually converted into cash and credited to the fund within a few days after the passage of the resolutions by the common council, since the fact that the cash proceeds were not actually in the treasury at the moment that the action of the common council became operative could not affect the validity of the common council's action or of the warrant.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1881, 1882; Dec. Dig. § 897.*]

5. MUNICIPAL CORPORATIONS (§ 868*)—FISCAL MANAGEMENT—POWER TO INCUR INDEBTEDNESS.

The restrictions in the charter of the city of Buffalo on the power of the common council in incurring obligations, where no funds had previously been provided to meet such obligations, relate only to charges against the general fund which must be raised annually by general taxation in advance of its use.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1842; Dec. Dig. § 868.*]

6. MUNICIPAL CORPORATIONS (§ 76*)—PROCEEDINGS OF COUNCIL—LEGISLATIVE RATIFICATION.

Laws 1909, c. 84, authorized the city of Buffalo to issue bonds to raise money to construct and equip new school buildings.  Laws 1911, c. 106,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

authorized the application of the proceeds of such sale of bonds to the purchase of school sites. The common council authorized a bond issue, and before the passage of Laws 1911, c. 106, the board of aldermen passed a resolution directing the issuance of a warrant in payment of a site selected. After the passage of that act, the board of councilmen concurred in such resolution. *Held*, assuming that the use of the proceeds of the bond issue for the purpose of purchasing school sites was not authorized by the first act, the issuance of a warrant, in pursuance to the resolution mentioned, was not illegal, since such resolution did not become the action of the common council and binding on it until approved by the board of councilmen, at which time such resolution was authorized, and it was within the power of the Legislature to authorize the city to apply the proceeds theretofore realized from bond issues to the purchase of lands, although not authorized in the original act.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 181, 687; Dec. Dig. § 76.*]

**7. MUNICIPAL CORPORATIONS (§ 120*)—CONSTRUCTION AND OPERATION—CONSTRUING WITH REFERENCE TO OTHER STATUTES.**

Such acts of the Legislature and resolutions of the boards constituting the common council should be read and construed together, so as to effectuate, and not destroy, the evident purpose and intent of the state and local legislative bodies.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 274–280; Dec. Dig. § 120.*]

**8. MUNICIPAL CORPORATIONS (§ 248*)—CONTRACTS—UNAUTHORIZED CONTRACTS —RATIFICATION.**

A municipal corporation, like an individual, may ratify the unauthorized acts and contracts of its agents or officers which are within the general scope of the corporate powers.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 684–686; Dec. Dig. § 248.*]

Mandamus by John A. Van Arsdale against William G. Justice, as Comptroller, and Clark H. Hammond, as Corporation Counsel, of the city of Buffalo. Writ granted.

Duane B. Tuttle and Charles L. Feldman, for the motion.
Clark H. Hammond, Corp. Counsel, and William S. Rann, Asst. City Atty., opposed.

WOODWARD, J. The applicant, John A. Van Arsdale, moves for a writ of peremptory mandamus, requiring the corporation counsel of the city of Buffalo to examine and pass upon the title to a certain piece of property in Buffalo, known as Josie Place, which he claims the city has agreed to purchase of him for a high school site, and to certify said title, if found good, to the comptroller of the city, and thereupon directing the comptroller to countersign and deliver to the applicant a warrant of $39,480, theretofore drawn by the city clerk, pursuant to the action of the common council of the city; both said corporation counsel and comptroller having refused to take such action. These officials base their refusal upon the grounds, substantially, that the action of the common council, directing this warrant to be drawn, was invalid, and that there were no funds in the city treasury applicable to the payment of this warrant, at the time it was ordered drawn. The essential facts presented by the moving and answering

affidavits are simple and undisputed, and present clear questions of law which should be susceptible of solution.

The growing demands for additional school facilities in Buffalo have, in recent years, become so imperative that special acts have been passed by the Legislature, authorizing the erection of new schools and the payment therefor by bond issues, as the drain upon the general fund raised by annual taxation would be too great to meet these increased requirements.

In 1909 an act (chapter 84) was passed, authorizing, by section 1, the city to issue its bonds, from time to time, as it may deem necessary, in a sum not to exceed $1,500,000, "for the purpose of raising money to construct and equip new school buildings in said city of Buffalo," but limiting the amount to be issued in any one fiscal year to $50,000. Section 2 of this act authorized the city to enter into contracts for the construction or equipment of new school buildings, prior to the issuing of bonds therefor, and made it the duty of the common council and mayor to issue bonds, from time to time, sufficient to provide funds for meeting obligations created under such contracts as they should become due.

In 1911 an act (chapter 106) was passed, which became a law on May 6, 1911, amending section 1 of the original act so as to authorize the issue of the bonds at a higher rate of interest than under the original act, and adding an express statement that the proceeds could be applied "to purchase lands to be used for school purposes." Section 2 of the original act was not amended.

[1] The amendment, stating that the proceeds of these bonds could be used to purchase lands for school sites, was doubtless made to avoid all possible question as to the availability of the proceeds of these bonds for the acquisition of lands upon which to erect school buildings, as it seems to me reasonable, both as an original proposition and upon authority, that the act as it originally stood, authorizing the application of the proceeds of the bonds to the construction and equipment of new school buildings, carried with it the authority to purchase lands upon which to construct and equip such buildings, as it would be impossible to construct a school building elsewhere than upon lands to be acquired therefor. Ketchum v. City of Buffalo, 14 N. Y. 356, affirmed 21 Barb. 294; Poillon v. City of Brooklyn, 101 N. Y. 132, 4 N. E. 191; Linn v. Omaha, 76 Neb. 552, 107 N. W. 983; Maxcy v. City of Oshkosh, 144 Wis. 238, 128 N. W. 899, 1138, 31 L. R. A. (N. S.) 787. The conclusion that I have reached in this matter is, however, not dependent upon the construction, above indicated, of the law as it originally stood on this point.

In January, 1910, the common council, with the approval of the mayor, directed the comptroller to advertise for proposals for a new high school site, to be located in South Buffalo, and among the proposals received was that of the applicant, offering to sell to the city the Josie Place site, bounded by four streets, for $39,480, the amount of the warrant which is withheld. The board of aldermen, in June, 1910, adopted a resolution directing the comptroller to purchase the said Josie Place site for high school purposes, and that a warrant be drawn on the consolidated school fund bond issue account in favor

of the comptroller for $39,480 to pay for the same, upon the approval of the title by the corporation counsel, which action was ratified by the board of councilmen in October, 1910. In the same month, the mayor vetoed this action of the common council. Thereupon the board of aldermen, on March 27, 1911, by requisite vote, overruled the mayor's veto and re-enacted its original resolution, in which action the board of councilmen by proper vote concurred on November 22, 1911; the action of the common council thus becoming effective, notwithstanding the mayor's veto.

[2] The action of the common council in directing the comptroller to advertise for proposals, the communication by Mr. Van Arsdale of his bid to the city, and the action of the common council thereon, amounted to an acceptance thereof, and made a binding and enforceable contract between him and the city, provided, of course, the common council had authority to make such a contract of purchase. Parr v. Village, 72 N. Y. 463; Argus v. Mayor, 55 N. Y. 495, 14 Am. Rep. 296.

Coming now to the question of funds available for the payment of the warrant, it appears that in January, 1911, the common council directed the issue and sale of $100,000 of said bond issue "for the purpose of raising money to construct and equip new school buildings in said city of Buffalo," and directed the comptroller to deposit the proceeds to the credit of the consolidated school fund bond issue account, and the resolution recited that such action was taken pursuant to chapter 84 of the Laws of 1909. These bonds were sold in the spring of 1911, and the proceeds placed to the credit of the said fund. This was the first $100,000 of the authorized bond issue of $1,500,000. On June 30, 1911, there remained from the sale of this first issue of bonds $79,841.56, which was merged into and became a part of the consolidated school fund bond issue account of the following fiscal year. While there was only standing to the credit of this fund on March 27, 1911, when the board of aldermen adopted the resolution directing the purchase of applicant's school site, the sum of $31,373.56, this was doubtless owing to the fact that all of the $100,000 bond issue theretofore issued had not been actually converted into cash, as appears from the fact that the balance standing to the credit of the account was increased by June 30, 1911, to $79,841.56, as above indicated.

On September 18, 1911, the board of aldermen adopted a resolution, which was, within a few days thereafter, approved by the board of councilmen and the mayor, directing the issue and sale of a further $100,000 of said bond issue "for the purpose of raising money to purchase lands to be used for school purposes and to construct and equip new school buildings in the city of Buffalo," and directing the comptroller to deposit the proceeds to the credit of the consolidated school fund bond issue account, and the resolution recited that the action was taken pursuant to chapter 84 of the Laws of 1909, as amended by chapter 106 of the Laws of 1911. The comptroller advertised the sale of this second $100,000 bond issue for October 6, 1911, and, receiving bids for only $55,000 thereof, sold this amount, of which he credited to the fund in question $25,000 on October 9, 1911, and $30,000 on October 11, 1911. On October 7, 1911, the

comptroller obtained the consent of the proper authorities to sell the remaining $45,000 of said bond issue at private sale, and on November 27, 1911, the common council authorized the comptroller, upon his request, to sell said $45,000 of said bond issue to what was known as the bond premium account, and this balance of $45,000 was actually credited to the consolidated school fund bond issue account on December 1, 1911. All of the bonds of this second $100,000 bond issue were dated October 1, 1911.

[3] Without going into the details of the balance standing at various times to the credit of the fund in question, as disclosed by the moving and answering affidavits, it appears that on November 27, 1911, the comptroller notified the common council that the balance in this fund from bonds authorized to be issued was then $55,255.91, and stated that this was insufficient to pay for various school sites which the common council had theretofore directed to be purchased, aggregating $66,367.20, and which included the Josie Place site. It would suffice to say, in answer to the claim that there were not sufficient funds to pay for the Josie Place site, that the resolution directing its purchase was passed before the resolution directing the purchase of the other sites embraced in this total of $66,367.20, and was therefore first payable; but it appears further, and in answer to the position taken by the comptroller, that the mayor vetoed the action of the common council as to the purchase of two of these sites, aggregating $17,887.20, with the result that the sites actually directed to be purchased, including the Josie Place site, amounted only to $48,480, and, according to the comptroller's figures, there thus stood to the credit of the fund at this time $55,255.91, a sum $9,000 in excess of what was needed to meet the warrants for the Josie Place site and another site which had not been vetoed, and it is undisputed that no other warrants against said fund had, up to that time, been ordered drawn or were outstanding. The contention that there were other prospective estimated charges against the fund, arising from unfinished contracts for building or furnishing schools, cannot, it seems to me, be taken into consideration, as they were not liens upon this fund, and the authorized bond issue remained available to meet such future charges when they became payable, to the extent of $1,300,000 of unissued bonds.

[4] Nor does it seem to me that the fact that, on March 27, 1911, when the board of aldermen directed the purchase of the site in question and the drawing of the warrant therefor, there happened to be only an actual cash credit to the bond account of $31,373.56, and on November 22, 1911, when the action of the board of aldermen was approved by the board of councilmen, such actual cash balance was only $10,255.91, constitutes any valid reason for the refusal of the comptroller to countersign and deliver the warrant in question, as it appears that more than enough of the bonds authorized to be issued for the purpose of meeting the warrant in question, as well as of other outstanding warrants properly chargeable to this fund, had theretofore been specifically authorized issued, and sales thereof had, which, with the exception of a balance of $45,000 of the last bond issue of $100,000, had been actually consummated, and said balance of $45,000

likewise converted into cash and credited to the fund within a few days after the final action of the board of councilmen. That the comptroller also so interpreted the situation at the time the board of councilmen approved the action of the board of aldermen on November 22, 1911, and considered the bond account good for the amount of the warrant which the common council had directed drawn in payment of the Josie Place site, appears quite conclusively from the fact that, on November 23, 1911, the city clerk, pursuant to the action of the common council, drew a warrant for $39,480 and transmitted the same to the comptroller, who forthwith charged the same against the consolidated school fund bond issue account upon the books in his office; and the same has at all times since so remained charged against said fund.

As the common council was given authority to issue bonds from time to time for a specific purpose, it could probably make binding contracts before actually authorizing the issue of any of such bonds, and thereupon be compelled to issue the necessary bonds to meet such contract obligations. It is not necessary, however, in the present case, to go so far, as it appears that the common council had actually authorized the issue of a sufficient amount of the entire bond issue to meet all warrants which it had directed drawn against such proceeds. The fact that the cash proceeds of the sale of such bonds may not have been actually in the treasury at the moment that the action of the common council directing a warrant drawn became operative cannot affect the validity of the action of the common council or of the warrant, which must be paid the moment sufficient funds appear in the treasury from the sale of bonds duly authorized to be issued and sold. The best interests of the city will, indeed, often be promoted by not issuing bonds in advance of the consummation of contracts and paying interest thereon during periods when the money is not actually needed. These propositions, as it seems to me, are consonant alike with sound business policy and with judicial authority. People v. Mayor, 144 N. Y. 63, 38 N. E. 1006; Davidson v. Village, 121 App. Div. 287, 105 N. Y. Supp. 803; Hunt v. City, 18 N. Y. 442; People v. Green, 64 N. Y. 499; People v. Palmer, 13 Misc. Rep. 727, 35 N. Y. Supp. 231; Pierce Co. v. Bleckwenn, 62 Hun, 265, 16 N. Y. Supp. 768; People v. Kelly, 76 N. Y. 475; Bradley v. Van Wyck, 65 App. Div. 293, 72 N. Y. Supp. 1034; Van Dolsen v. Board, 162 N. Y. 446, 56 N. E. 990.

[5] I do not find any provisions of the charter of Buffalo in conflict with these views. The restrictions there upon the power of the common council in incurring obligations, where no funds have previously been provided, relate properly to charges against the general fund, which must be raised annually by general taxation in advance of its use, and which, on grounds of public policy, should not, under ordinary circumstances, be overdrawn, and this distinction is clearly recognized in the case of Williams v. City of New York, 118 App. Div. 756, 104 N. Y. Supp. 14, cited by the respondent.

[6] The contention of respondent's counsel that the entire action of the common council in directing the warrant in question drawn was invalid because, on March 27, 1911, when the board of aldermen passed the resolution respecting the purchase of the Josie Place site and the

drawing of a warrant therefor, the amendatory act (chapter 106 of the Laws of 1911) had not gone into effect, and therefore the proceeds of the bond issue could not then be devoted to the purchase of school lots, but only to the construction of new school buildings, cannot, I think, be sustained, for various reasons.   In the first place, as has already been shown, the authority under the act, as it originally stood, to use the proceeds of the bond issue for the construction and equipment of new school buildings, in my opinion carried with it the necessary and implied authority to use such proceeds for the purchase of lands upon which to erect such buildings.   But, even if such were not the case, the result would still be the same, as it appears that, subsequent to the time when the amendatory act specifically authorizing the use of such proceeds for the purchase of lands for school purposes went into effect, and before the board of councilmen had acted upon the resolution of the board of aldermen directing the purchase of the Josie Place site and the drawing of a warrant in payment therefor, the board of aldermen pursuant to the amendatory act directed a further issue of $100,000 of these bonds for the purchase of lands, as well as the construction of new school buildings, thereby in any event ratifying its prior action and providing funds to carry the same into effect; and both this action, directing such further bond issue, and the original resolution of the board of aldermen, directing the purchase and the drawing of the warrant, were thereafter approved by the board of councilmen, which approval alone made the action that of the common council of the city and binding upon it. Taking still another view, the action of the board of aldermen, taken March 27, 1911, directing the comptroller to purchase the premises in question, when approved by the board of councilmen, doubtless created a contract of purchase binding upon both parties, and the proper fund upon which to draw a warrant therefor was only an incident of the essential action taken. It was clearly within the power of the Legislature to authorize the city to use funds theretofore realized from bond issues under the original act, as well as under the amendatory act, to be applied for the purchase of lands as well as the construction of school buildings, even if we assume that such power was not given under the original act.

[7] The various acts of the Legislature and of the boards constituting the common council thereunder should obviously be read together and construed so as to effectuate, and not to destroy, the evident purpose and intent of both the state and local legislative bodies in regard to the purchase of this school site, and, when so interpreted, the validity of the action, it seems to me, is clearly established.

[8] In this connection, it is well settled that a municipal corporation, like an individual, may ratify the unauthorized acts and contracts of its agents or officers which are within the general scope of the corporate powers.   Peterson v. Mayor, 17 N. Y. 449; Abells v. City, 7 App. Div. 501, 40 N. Y. Supp. 233; Dillon on Municipal Corporations (4th Ed.) § 463.

I have therefore reached the conclusion that the applicant is entitled to a writ of peremptory mandamus, with costs, granting him the relief which he seeks; and an order to that effect may be entered.